# **EXHIBIT A**

Filing # 182392532 E-Filed 09/22/2023 08:02:58 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION**<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | **CASE NUMBER**<br><br>2023-023321-CA-43 |
| **PLAINTIFF(S)**<br><br>RIGI KOPF, LLC, a Florida limited liability company, | **VS.  DEFENDANT(S)**<br>SKYBRIDGE MIAMI, LLC, a Delaware Limited Liability Company, FELIPE MONROY TORRES, individually, ARIEL ZEEV PICKER SCHATZ, individually, BOBE HOLDINGS LIMITED PARTNERSHIP, a Prince Edward Island (Canada) Limited Partnership, and OLGA SCHATZ SKVIRSKY, individually | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s):  ___SKYBRIDGE MIAMI, LLC___

INCORP. SERVICES, INC.,  Registered Agent

919 N. Market Street, Suite 950

Wilmington, Delaware 19801

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney:  ___John H. Ruiz, Esq.___

whose address is:  ___MSP Recovery Law Firm___

2701 S. Le Jeune Road, #10th Floor

Coral Gables, FL  33134

within 20 days " Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days." after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY:_____<br>**DEPUTY CLERK** | **DATE**<br><br>9/25/2023 |
|---|---|---|

Date Served: 10/6/2023  **AMERICANS WITH DISABILITIES ACT OF 1990**
Time Served:
Server: WB  9703494  )36~  **ADA NOTICE**

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

JOSE H. MEJIA, P. I. INC. 161-E BENTLEY DR, MIAMI SPRINGS, FL 33166 (305) 871-6477 info@miamiprocessserver.com
CLK/CT. 314  Rev. 06/23                                                      Clerk's web address: www.miamidadeclerk.gov

Filing# 182252528 E-Filed 09/20/2023 02:47:12 PM

IN THE CIRCUIT COURT OF THE 11 TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS DIVISION

CASE NO: 2023-023321-CA-43

RIGI KOPF, LLC, a Florida limited liability
company,

       Plaintiff,

v.

SKYBRIDGE MIAMI, LLC, a Delaware
Limited Liability Company, FELIPE
MONROY TORRES, individually, ARIEL
ZEEV PICKER SCHATZ, individually,
BOBE HOLDINGS LIMITED
PARTNERSHIP, a Prince Edward Island
(Canada) Limited Partnership, and OLGA
SCHATZ SKVIRSKY, individually,

       Defendants.

- - - - - - - - - - - - - - -        /

## COMPLAINT

Plaintiff, RIGI KOPF, LLC (the "Plaintiff" or "RIGI"), brings this action against the

following Defendants, SKYBRIDGE MIAMI, LLC ("Sky Plus"), FELIPE M. TORRES ("Mr.

Torres"), ARIEL ZEEV PICKER SCHATZ ("Mr. Picker"), BOBE HOLDINGS LIMITED

PARTNERSHIP ("BOBE Holdings"), and OLGA SCHATZ SKVIRSKY ("Ms. Skvirsky")

(collectively, the "Defendants"). In support thereof, Plaintiff alleges as follows:

## JURISDICTION, PARTIES, AND VENUE

1.    At all times material to this action, the Plaintiff, RIGI KOPF, LLC, is a duly

organized, validly existing Florida Limited Liability Company with a principal place of business

in Miami-Dade County, Florida.

2.      At all times material to this action, the Defendant SKYBRIDGE MIAMI, LLC, is a Delaware Limited Liability Company that conducts business in Florida and whose corporate representative is: Incorp. Services, Inc., 919 North Market Street, Suite 950, Wilmington, Delaware 19801.

3.      This Court has personal jurisdiction over the Defendant SKYBRIDGE MIAMI, LLC pursuant to Section 48.193 of the Florida Statutes, as it: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to a person in Florida; and (4) engaged in substantial and not isolated activities in Florida.   The Defendant SKYBRIDGE MIAMI, LLC has, thereby, directed the acts complained of herein in the State of Florida and has utilized instrumentalities located in the State of Florida to carry out the acts alleged herein.

4.      Upon information and belief, the Defendant Felipe Monroy Torres is a resident of Mexico who conducts business in the United States; particularly, in Arizona and in Florida.   Upon information and belief, Mr. Torres has an address in the United States of 2415 E. Camelback Road, Suite 700, Phoenix, AZ 85016.

5.      This Court has personal jurisdiction over the Defendant Felipe Monroy Torres pursuant to Section 48.193 of the Florida Statutes, as he: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to a person in Florida; and (4) engaged in substantial and not isolated activities in Florida.   The Defendant Felipe Monroy Torres has, thereby, directed the acts complained of herein in the State of Florida and has utilized instrumentalities located in the State of Florida to carry out the acts alleged herein.

2

6.      Upon information and belief, the Defendant Ariel Picker is a resident of Miami-Dade County, Florida with an address of 10201 Collins Avenue, Apt. 2701, S. Bal Harbour, Florida 33154.

7.      This Court has personal jurisdiction over the Defendant Ariel Zeev Picker Schatz pursuant to Section 48.193 of the Florida Statutes, as he: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to a person in Florida; and (4) engaged in substantial and not isolated activities in Florida.  The Defendant Ariel Picker has, thereby, directed the acts complained of herein in the State of Florida and has utilized instrumentalities located in the State of Florida to carry out the acts alleged herein.

8.      Upon information and belief, the Defendant Bobe Holdings Limited Partnership is a Prince Edward Island (Canada) Limited Partnership that conducts business in the United States; particularly, in Florida. Upon information and belief, Bobe Holdings has an address of 141 Kent Street, Suite 300, Charlottetown, PE C1A 1N3, Canada. Bobe is not registered to do business in the State of Florida but nevertheless made a loan to an entity with collateral in Florida and predicated on a an FBO that is located in the City of Opa Locka located in Miami Dade County.

9.      This Court has personal jurisdiction over the Defendant Bobe Holdings Limited Partnership pursuant to Section 48.193 of the Florida Statutes, as it: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to a person in Florida; and (4) engaged in substantial and not isolated activities in Florida. The Defendant Bobe Holdings Limited Partnership has, thereby, directed the acts complained of herein in the State of Florida and has utilized instrumentalities located in the State of Florida to carry out the acts alleged herein.

10.    Upon information and belief, the Defendant Olga Schatz Skvirsky is a resident of Mexico with an address at Bosques de Alisos 45B, Colonia Bosques de las Lomas, Cuajimalpa de Morelos, Postal Code 05120, Mexico City, Mexico.

11.    This Court has personal jurisdiction over the Defendant Olga Schatz Skvirsky pursuant to Section 48.193 of the Florida Statutes, as she: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to a person in Florida; and (4) engaged in substantial and not isolated activities in Florida. The Defendant Olga Shatz Skvirksy has, thereby, directed the acts complained of herein in the State of Florida and has utilized instrumentalities located in the State of Florida to carry out the acts alleged herein. The acts described herein were committed in Miami-Dade County, Florida.

12.    The agreements referenced herein were executed in Miami-Dade County, Florida.

13.    Venue is proper in Miami-Dade County, Florida, as the causes of action accrued in Miami-Dade County, Florida.

14.    This is an action for damages in excess of Seven Fifty Thousand Dollars ($750,000.00), exclusive of interest, costs, and attorneys' fees.

15.    All conditions precedent before the filing of the instant action have either been performed, waived, or performance will be futile.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I.    BACKGROUND OF PARTNERSHIP KOPF ACQUISITIONS, LLC

1.      On May 26, 2020, the Defendant Sky Plus, through its Managing Member, Mr. Picker, and the Plaintiff entered into the Limited Liability Company Operating Agreement of KOPF Acquisitions, LLC[1] (the "LLCA")[2]. *See Exhibit "A," LLCA.*

2.      Notably, the Co-Defendant Ms. Schatz is the sister of the Co-Defendant Mr. Picker.[3]

3.      Additionally, Ms. Schatz is 45% owner of 145 Fly Services SA DE CV, which is the 100% owner of Sky Plus.

4.      As per the LLCA, Sky Plus and the Plaintiff were identified as members of KOPF. *Id.*

5.      Both Sky Plus and RIGI entered into the LLCA to set forth therein the manner in which KOPF would be governed and the respective rights, duties, obligations, responsibilities, and understandings of the members and the manager who would be conducting the affairs of KOPF. *See Exhibit "A," LLCA.*

6.      Pursuant to Section 4.3(a) of the LLCA, Sky Plus was appointed as the initial Administrative Member of KOPF by all the members of KOPF, whereby Sky Plus agreed to serve

---

[1] As referenced herein, KOPF Acquisitions, LLC shall be referred to as "KOPF".

[2] Although the LLCA contains a confidentiality provision, the agreement is being attached to this action pursuant to Section 9.2 of the LLCA as such disclosure is "required by law … in a[] Court proceeding." *See Exhibit "A," LLCA.*

[3] As per the LLCA, Ms. Schatz is identified as a "Controlled Affiliate" which entails "the spouse, parents, grandparents and descendants (each, a 'Family Member') od (A) Ariel Zeev Picker Schatz, Olga Shatz, or Vicky Rahunouv (each a 'Sky Plus Control Person') or the trustees of any one or more trusts for the primary benefit of any one or more Family Members of a Sky Plus Control Person". *See Exhibit "A," LLCA,* p. A-2.

in the capacity of Administrative Member pursuant to the terms and conditions of the LLCA. *See Exhibit "A," LLCA,* p. 10.

7.      In accordance with Section 4.1 of the LLCA, Sky Plus, as Administrative Member of KOPF, had a duty to: (i) designate a Manager to conduct the day-to-day operations of KOPF, and (ii) manage and conduct the operations and related contractual, financial, and other affairs of KOPF and make all decisions regarding KOPF, subject to Section 4.2 of the LLCA, wherein certain actions of KOPF required the approval of all of the Members, which for purposes of the LLCA were to be deemed Major Decisions ("Major Decisions"). *See Exhibit "A," LLCA,* pp. 5-7.

8.      These Major Decisions included, but were not limited to the: (i) approval of the terms and conditions of any indebtedness incurred by KOPF for money borrowed by KOPF, (ii) approval of any contract or agreement between KOPF and a member or any affiliate of a member, other than as specifically permitted thereunder, (iii) action to create, incur, assume, refinance, extend, modify or otherwise become liable with respect to any obligation for borrowed money (including guarantees of the indebtedness or other obligations of any person or of any subsidiary or affiliate of KOPF) or issue any bonds, debentures, notes or other evidences of indebtedness, in any transaction or series of transactions, and/or the approval of a pledge, mortgage, hypothecation or encumbrance of the real estate projects, or any interest therein or any beneficial interest in KOPF. *See Exhibit "A," LLCA.*

9.      Pursuant to Section 4.8 of the LLCA, Sky Plus, in its capacity as Administrative Member of KOPF, appointed the Co-Defendant, Mr. Torres, to be the Manager of KOPF. *See Exhibit "A," LLCA,* p. 13. Specifically, Mr. Torres was tasked with the following:

> Section 4.8  Manager and Officers.  The Administrative Member may delegate the management and conduct of the Company's day-to-day business affairs to Managers or Officers of the Company, who may receive compensation for acting in such capacity.  Notwithstanding the foregoing, certain decisions or actions must in any event be expressly approved in advance by the Administrative Member before being undertaken by any Manager, Officer or other employee of the Company.  Such decisions and actions may be identified in written resolutions or policies adopted by the Administrative Member from time to time.  The Administrative Member, the Managers and each Officer shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Officers, employees, or committees of the Company, or by any other Person as to matters the Administrative Member, Managers or Officers reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid.

*See Exhibit "A," LLCA,* p. 13.    Essentially, Mr. Torres had been delegated a duty to manage and conduct KOPF's day-to-day business affairs.

10.    Both Sky Plus and Mr. Torres had a fiduciary duty to KOPF. They also had a duty not to lie, deceive, or withhold information from the Plaintiff.

11.    Notwithstanding, as described more fully herein, the Co-Defendants Mr. Picker, Ms. Skvirsky, and Mr. Torres acted in concert and conspired to place a debt against KOPF while hiding the fact that Mr. Picker owned or otherwise controlled the interests of the alleged lender Bobe Holdings, which provided a loan to KOPF whose default rate is 15%.

II.    **FIRST LOAN – AA ACQUISITIONS, LLC**

12.    In accordance with Section 4.2(d) of the LLCA, the members had agreed to preapprove and take such other actions appropriate or necessary to enter into that certain Acquisition Loan with AA Acquisitions, LLC, a Florida limited liability company ("AA Acquisitions"), contemporaneous with the closing for the purchase of a certain leasehold interest from AA Acquisitions.

13.     In furtherance of the foregoing, on July 14, 2020, KOPF issued a certain Promissory Note for value received promising to pay to the order of AA Acquisitions the sum of $8,210,271.00, with an interest rate of 6.0% per annum, with maturity date on July 14, 2022 (the "AA Note"). *See Exhibit "B," AA Note*.

14.     Notably, KOPF had the option to extend the maturity date of the AA Note for an additional 12 months by: (a) providing AA Acquisitions with no less than 30 days prior written notice of KOPF's election to extend such period, and (b) payment of all interest that would be due and payable under the AA Note accruing from the date of issuance of the AA Note. *See Exhibit "B," AA Note*. Picker and Torres purposely failed to extend the loan so that they could have defendant Bobe Holdings provide a loan to KOPF.  Picker and Torres know that they controlled Sky Plus and that Sky Plus could determine when capital calls could be put in place to divest RIGI of its equity interests.  Accordingly, both Picker and Torres purposely allowed the Bobe Holdings Note (as defined below) to go into default and then requested a capital call to divest RIGI of part of its equity interest.

**III.     MATURITY OF AA NOTE AND BOBE NOTE**

15.     On June 14, 2022, 30 days prior to the AA Note's maturity date, Mr. Torres purposely failed to provide AA Acquisitions with notice to extend AA Note's maturity date for an additional 12 months.

16.     After several attempts by RIGI, through the manager, Ronald A. Vogel II ("Vogel"), to persuade Mr. Torres and Sky Plus to act upon the impending default of the AA Note, Vogel attempted to obtain a bridge loan with City National Bank ("CNB") to satisfy the AA Note before the impending maturity date.

8

17.     Mr. Torres and Sky Plus offered to obtain interim financing through the Co-Defendant Bobe Holdings to pay off the debt to AA.  At no time was the ownership and/or control of Bobe Holdings by Picker and his family disclosed to RIGI.

18.     Bobe Holdings gave a loan of $9,000,000.00.

19.     On July 14, 2022, the AA Note matured, and payment of principal and accrued interest became due wherein Bobe Holdings provided the loan proceeds, part of which were used to pay off the AA loan.

20.     In order to avoid default on the AA Note by KOPF, the authorized manager of KOPF, Mr. Torres together with instructions from Mr. Picker authorized, approved, and ratified the execution and delivery of KOPF to enter into a revolving loan in the maximum principal amount of $9,000,000 from Bobe Holdings.  This is evidenced by that certain Unanimous Written Consent of the Manager and Members of KOPF (the "Unanimous Consent") dated July 14, 2022, as required by Section 4.2 of the LLCA.  *See Exhibit "C," Unanimous Written Consent.*

21.     The Unanimous Consent failed to disclose the maturity rate and the interest rate that the Bobe Holdings Note would be subject to.  As such, the interest rate and the maturity date that was later incorporated into the Bobe Holdings Note was not approved by the Members.

22.     On July 14, 2022, a Revolving Promissory Note for $9,000,000.00 was issued, wherein KOPF unconditionally promised to pay such amount to the order of Bobe Holdings, with an interest rate of 7.0% per annum, with a maturity date of January 10, 2023 (the "Bobe Holdings Note").  *See Exhibit "D," Bobe Holdings Note.*  Upon the occurrence of a default of the Bobe Holdings Note, the interest rate would automatically increase to 15% per annum.  *Id.*

23.     On July 14, 2022, KOPF draws down on the Bobe Note to pay off the AA Note, whereas the principal drawn by KOPF on the Bobe Note is unknown by RIGI.

24.     Mr. Torres and Sky Plus failed to disclose to RIGI that Bobe Holdings was in fact a related party and an Affiliate (as defined in the LLCA) of Sky Plus and, as such, issued the Bobe Holdings Note *without* the appropriate approvals required as a Major Decision, in accordance with Section 4.2(a)(2) of the LLCA.  Notably, notices under the Bobe Holdings Note were to go to Mr. Picker, who was the Managing Member of Sky Plus.

25.     On September 22, 2022, CNB refused to close on the loan RIGI had been attempting to obtain on behalf of KOPF, citing to issues pertaining to the members of Sky Plus. Specifically, KYC (Know Our Customer) by CNB revealed substantial issues relating to affairs coming out of Mexico that pertained why CNB would no longer close on the deal that CNB had offered for financing in the amount of $9,200,000.00, with interest at 5.95%, only accrued and payable over 12 months with a balloon payment due at maturity.

26.     In fact, there was an article that was published on September 4, 2022 (before CNB refused to close on the loan), which indicated that the Co-Defendant, Ms. Skyvirsky was involved in a scheme to defraud the Instituto Superior de Auditoría y Fiscalización de Sonora (ISAF).  *See* https://indicepolitico.com/gobierno-de-claudia-pavlovich-vendio-inmuebles-por-559-mdp-para-liquidar-deudas/.

## IV.     **MATURITY OF BOBE HOLDINGS NOTE**

27.     On January 10, 2023, the Bobe Holdings Note matured and KOPF defaulted on the Bobe Note.  Mr. Torres and Sky Plus failed to attempt to refinance prior to the Bobe Holdings Note maturing.

28.     During this time, no default notices were sent by Bobe Holdings.

29.     On February 24, 2023, after attempts were made by RIGI to secure financing for KOPF, Benmark Capital provided a term sheet to KOPF that would satisfy the Bobe Holdings

Note (the "Benmark LOI").  Mr. Torres and Sky Plus did not agree to the terms of the Benmark LOI and claimed that there were better terms to be obtained from JP Morgan Chase.

30.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

31.     On March 23, 2023, after attempts were made by RIGI to secure financing for KOPF, Amrecap provided a term sheet to KOPF that would satisfy the Bobe Holdings Note (the "Amrecap LOI").  Mr. Torres and Sky Plus did not agree to the terms of the Amrecap LOI, and claimed that there were better terms to be obtained from JP Morgan Chase.

32.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

33.     On April 25, 2023, after attempts were made by RIGI to secure financing for KOPF, American Real Estate Capital provided a term sheet to KOPF that would satisfy the Bobe Holdings Note (the "AREC LOI"). Mr. Vogel, on behalf of RIGI, conveyed this to Mr. Torres and Sky Plus, but they were unresponsive.

34.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

35.     On June 16, 2023, after attempts were made by RIGI to secure financing for KOPF, Related Fund ("Related") offered terms to satisfy the Bobe Holdings Note (the "Related LOI"). Mr. Vogel, on behalf of RIGI, conveyed this to Mr. Torres and Sky Plus, but they were unresponsive.

36.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

37.     On June 29, 2023, Fountainblue Aviation ("FA") provided a letter of intent to purchase 100% of the equity interests of KOPF for $30,000,000.00 (the "FA LOI") to RIGI.  RIGI conveyed the FA LOI orally to Mr. Picker and to Sky Plus.  As a result of the FA LOI, Mr. Vogel verbally negotiated with FA and informed Mr. Picker, Mr. Torres and Sky Plus.   Mr. Picker, Mr. Torres and Sky Plus were initially receptive and asked Mr. Vogel to obtain a higher number, but then advised Mr. Vogel that they were not interested in selling for any number.

38.     Again, on August 16, 2023, RIGI conveyed the FA LOI to Mr. Torres and Sky Plus, and indicated RIGI's willingness to accept FA's offer.  RIGI further advised Mr. Torres and Sky Plus that if Sky Plus did not accept FA's offer, then Sky Plus should offer to purchase RIGI's interest in KOPF.  During this time, Mr. Picker agreed to purchase RIGI's interest in KOPF at a $28 million dollar valuation, but Mr. Vogel was then informed that they were not interested in buying or selling.

39.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

40.     On September 4, 2023, Mr. Torres provided Sky Plus and RIGI a notice of default (the "Notice of Default") that had been sent by Bobe Holdings. *See Exhibit "E," Notice of Default*.

41.     The Notice of Default demanded that payment be made in full no later than September 30, 2023. *Id.* Mr. Torres and Sky Plus *did not* provide any financial solution and were unresponsive as to any attempt from RIGI to refinance such obligation.

42.     Meanwhile, the Bobe Holdings Note was accruing interest at a rate of 15% per annum.

43.     On September 6, 2023, Mr. Torres, who was now acting on behalf of Sky Plus as its Manager, made a formal capital call request pursuant to Section 2.2(a) of the LLCA (the "Capital Call").

44.     The Capital Call requests were written on behalf of the Co-Defendant Sky Plus, and they requested $9,400,000.00 in additional capital contributions from the members to pay off the Bobe Holdings Note. *See Exhibit "F," Capital Call Requests.*

45.     In such Capital Call requests, reference was made to the payment in full of the Bobe Holdings Note, which continues to accrue interest at a rate of 15% per annum, and the failure to make such contribution shall result in the dilution of RIGI's membership interests in accordance with Section 2.3 of the LLCA. *See Exhibit "F," Capital Call Requests.*

46.     Pursuant to the Capital Call, RIGI is required to contribute $3,760,000.00 within 10 business days of the receipt of the Capital Call.

47.     Moreover, the amounts requested in the Capital Call are not in line with any of the cashflow projections that were provided over the year. *See Exhibit "F," Capital Call Requests.* The amounts requested further seeks funds from members that have not been approved in an annual budget, which seeks to bind the members to the Bobe Holdings debt without RIGI's consent in violation of Section 4.2(a)(6) of the LLCA.

48.     Overall, the Defendants mismanaged KOPF, as Sky Plus was its Administrative Member and Mr. Torres was its Manager.

**CAUSES OF ACTION**

**COUNT I**
**_MATERIAL MISREPRESENTATION AGAINST ALL DEFENDANTS_**

Plaintiff realleges and reasserts all allegations set forth in Paragraphs 1 through 48, as if fully set forth herein.

49.     The Plaintiff and the Co-Defendant Sky Plus entered into the LLCA.

50.     As a result of the LLCA, KOPF entered into a transaction with AA Acquisitions, wherein KOPF executed a Promissory Note in favor of AA Acquisitions in the amount of $8,210,271.00.

51.     The AA Note was obtained as a seller's financing for the leasehold that was purchased by KOPF.

52.     The AA Note had an option to extend its maturity date.  However, the option to extend the maturity date of the AA Note was never exercised by Mr. Torres.

53.     As a result of such failure to extend the maturity date of the AA Note, the AA Note matured, and the payment became due.

54.     In order to avoid a default of the AA Note by KOPF, the managers and members of KOPF authorized and approved for KOPF to enter into a revolving loan with Bobe Holdings in the amount of $9,000,000.00, the Bobe Holdings Note.

55.     In entering into the Bobe Holdings Note, Mr. Torres, Mr. Picker and Sky Plus materially misrepresented and concealed the truth about the operations of Bobe Holdings, which lured the parties to enter into the Bobe Holdings Note.

56.     Mr. Torres, Mr. Picker and Sky Plus materially misrepresented and concealed the truth about the operations of Bobe Holdings.

14

57.     Specifically, the Defendants conspired and concealed the relationship between Picker, Torres, and Sky Plus.  The true facts were hidden from the Plaintiff because the Plaintiff would never have agreed that a lender that is controlled by one of the members would have full discretion as the controlling manager to claim a default on the loan and, thereby, attempt to divest the equity of the Plaintiff.  The Defendants withheld such information to conceal the blatant strategy of placing a high interest defaulted rate loan so that they could benefit from entering into the equity in two ways.  One, a higher interest rate to KOPF meant that less profit was available and that equity would be diluted as more money had to be pumped into the business.  At the same time, because a substantial capital call was strategized so that the Defendants could make a capital call and dilute the Plaintiff or otherwise profit from very high interest rates as a result of the fraud.  The Plaintiff relied on the Defendants to act honestly and as honest people and not withhold information from the Plaintiff to the detriment of the Plaintiff.

58.     Mr. Torres, Picker, and Sky Plus materially misrepresented and concealed the fact that Bobe Holdings was a related party and an affiliate of Sky Plus.

59.     At all times relevant, the Defendants knew that Plaintiff was relying on the accuracy of the information supplied to them to lure them into entering the Bobe Holdings Note or otherwise not object to it.

60.     Mr. Torres and Sky Plus knew or should have been aware that prior to Plaintiff entering into the Bobe Holdings Note, the approval of all the Members as per Section 4.2(a)(2) of the LLCA was required.  *See Exhibit "A," LLCA.*

61.     Specifically, Section 4.2 of the LLCA provides that:

Section 4.2    Major Decisions.

(a)    The following actions shall require the approval of all the Members, and for all purposes hereunder be deemed to be Major Decisions ("**Major Decisions**"):

(1)    approval of the terms and conditions of any indebtedness incurred by the Company for money borrowed by the Company;

(2)    approval of any contract or agreement between the Company and a Member or any Affiliate of a Member other than as specifically permitted hereunder;

(3)    issuance or sale of additional Membership Interests or admission of a new member in the Company;

*See Exhibit "A," LLCA.*

62.    The Defendants misrepresented this material fact by withholding their relationship as well as having control of both KOPF and Bobe Holdings. Specifically, the Defendants conspired and concealed the relationship between Bobe Holdings, Picker, Torres, and Sky Plus. The true facts were hidden from the Plaintiff because the Plaintiff would never have agreed that a lender that is controlled by one of the members would have full discretion as the controlling manager to claim a default on the loan and, thereby, attempt to divest the equity of the Plaintiff.

63.    The Defendants withheld the information to conceal the blatant strategy of placing a high interest defaulted rate loan so that they could benefit from eating into the equity in two ways. One, a higher interest rate to KOPF meant that less profit was available, and that equity would be diluted as more money had to be pumped into the business. At the same time, because a substantial capital call was strategized so that the Defendants could make a capital call and dilute the Plaintiff or otherwise profit from very high interest rates as a result of the fraud. The Plaintiff relied on the Defendants to act honestly and as honest people and not withhold information from the Plaintiff to the detriment of the Plaintiff.

64.     The Defendants omitted these statements so that the Plaintiff would rely upon the Defendants being truthful and not conceal the true facts and conflicts of interest. The Plaintiff relied on such misrepresentations and has suffered damages.

**WHEREFORE**, Plaintiff demands judgment for damages against the Defendant, together with rescission, as well as interest, costs, and attorneys' fees, and such other and further relief as this Honorable Court finds just and proper.

### COUNT II
### *FRAUD IN THE INDUCEMENT OF THE BOBE HOLDINGS NOTE AGAINST BOBE HOLDINGS (RESCISSION)*

Plaintiff realleges and reasserts all allegations set forth in Paragraphs 1 through 48, as if fully set forth herein.

65.     This is an action against Bobe Holdings for rescission and cancellation of the Bobe Holdings Note.

66.     On July 14, 2022, KOPF entered into the Bobe Holdings Note with Bobe Holdings in the amount of $9,000,000.00.

67.     The Co-Defendant Mr. Torres executed the Bobe Holdings Note on behalf of KOPF, as the manager, and the Co-Defendant Mr. Picker was to receive notices related to the Bobe Holdings Note on behalf of Bobe Holdings.

68.     Mr. Torres executed the Bobe Holdings Note in violation of Section 4.2(a)(2) of the LLCA, which provides that:

Section 4.2    Major Decisions.

(a)    The following actions shall require the approval of all the Members, and for all purposes hereunder be deemed to be Major Decisions ("**Major Decisions**"):

(1)    approval of the terms and conditions of any indebtedness incurred by the Company for money borrowed by the Company;

(2)    approval of any contract or agreement between the Company and a Member or any Affiliate of a Member other than as specifically permitted hereunder;

(3)    issuance or sale of additional Membership Interests or admission of a new member in the Company;

*See Exhibit "A," LLCA.*

69.    The Bobe Holdings matured on January 10, 2023.

70.    As of the date of filing this action, the Bobe Holdings Note has not been paid off.

71.    In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff his relationship with Bobe Holdings.

72.    In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff Mr. Picker's relationship with Bobe Holdings.

73.    In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff Sky Plus's relationship with Bobe Holdings.

74.    Defendants knew that, at all material times, that they were not providing the Plaintiff with the correct state of affairs of Bobe Holdings.

75.    As a result of these misrepresentations, the Bobe Holdings Note was executed.

76.    As a result of Defendants' misrepresentations, the amount due and owing on the Bobe Holdings Note is outstanding.

77.    In reliance of said representations, the Bobe Holdings Note was entered into.

78.     The Defendants were enriched by KOPF entering into the Bobe Holdings Note.

79.     Defendants purposefully hid the truth of the relationship between them and Bobe Holdings by withholding their relationship, as well as control of both KOPF and the lender Bobe Holdings. Specifically, the Defendants conspired and concealed the relationship between Picker, Torres, and Sky Plus.  The true facts were hidden from the Plaintiff because the Plaintiff would never have agreed that a lender that is controlled by one of the members would have full discretion, as the controlling manager, to claim a default on the loan and thereby attempt to divest the equity of the Plaintiff.

80.     The Defendants withheld such information to conceal the blatant strategy of placing a high interest defaulted rate loan so that they could benefit from eating into the equity in two ways.  One, a higher interest rate to KOPF meant that less profit was available and that the equity would be diluted as more money had to be pumped into the business.  At the same time, because a substantial capital call was strategized so that the Defendants could make a capital call and dilute the Plaintiff or otherwise profit from a very high interest rates as a result of the fraud.  The Plaintiff relied on the Defendants to act honestly and as honest people and not withhold information from the Plaintiff all to the detriment of the Plaintiff.

81.     Plaintiff had no reason to suspect that the information being provided to Plaintiff and/or to KOPF was misleading.

82.     KOPF would not have entered into this transaction but for the Defendants' misrepresentations.

83.     Defendants, thereby, induced KOPF to enter into the Bobe Holdings Note.

84.     As a result, Plaintiff and KOPF has suffered damages, and continues to suffer damages.

85.     Plaintiff and KOPF are thereby entitled to a rescission of the Bobe Holdings Note based upon the existence of fraud, false representations, and fraudulent misrepresentation, wherein it has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands that this Court return the parties to the status quo ante, and cause the Bobe Holdings Note to be rescinded, plus entitled the Plaintiff entitlement to attorneys' fees and costs.

### COUNT III
### *FRAUD BASED ON NONDISCLOSURE AGAINST ALL DEFENDANTS*

Plaintiff realleges and reasserts all allegations set forth in Paragraphs 1 through 48, as if fully set forth herein.

86.     This is an action against Defendants for fraud based upon the nondisclosure of material conditions that Defendants had an obligation to disclose to the Plaintiff.

87.     On July 14, 2022, KOPF entered into the Bobe Holdings Note with Bobe Holdings in the amount of $9,000,000.00.

88.     The Co-Defendant Mr. Torres executed the Bobe Holdings Note on behalf of KOPF, as the manager, and the Co-Defendant Mr. Picker executed the note on behalf of Bobe Holdings.

89.     Mr. Torres executed the Bobe Holdings Note in violation of Section 4.2(a)(2) of the LLCA, which provides that:

Section 4.2   Major Decisions.

(a)   The following actions shall require the approval of all the Members, and for all purposes hereunder be deemed to be Major Decisions ("**Major Decisions**"):

(1)   approval of the terms and conditions of any indebtedness incurred by the Company for money borrowed by the Company;

(2)   approval of any contract or agreement between the Company and a Member or any Affiliate of a Member other than as specifically permitted hereunder;

(3)   issuance or sale of additional Membership Interests or admission of a new member in the Company;

*See Exhibit "A," LLCA.*

90.   The Bobe Holdings matured on January 10, 2023.

91.   As of the date of filing this action, the Bobe Holdings Note has not been paid off.

92.   In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff his relationship with Bobe Holdings.

93.   In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff Mr. Picker's relationship with Bobe Holdings by withholding their relationship as well as control of both KOPF and the lender Bobe Holdings. In entering into the Bobe Holdings Note, the Co-Defendant Mr. Torres failed to disclose to the Plaintiff Sky Plus's relationship with Bobe Holdings by withholding their relationship as well as control of both KOPF and the lender Bobe Holdings.

94.   Specifically, the Defendants conspired and concealed the relationship between Picker, Torres and Sky Plus.  The true facts were hidden from the Plaintiff because the Plaintiff would never have agreed that a lender that is controlled by one of the members would have full discretion, as the controlling manager, to claim a default on the loan and, thereby, attempt to divest

the equity of the Plaintiff. The Defendants withheld the information to conceal the blatant strategy of placing a high interest defaulted rate loan so that they could benefit from eating into the equity in two ways. One, a higher interest rate to KOPF meant that less profit was available, and that equity would be diluted as more money had to be pumped into the business. At the same time, a capital call was strategized so that the Defendants could make a capital call and dilute the Plaintiff or, otherwise, profit from very high interest rates as a result of the fraud. The Plaintiff relied on the Defendants to act honestly and as honest people and not withhold information from the Plaintiff to the detriment of the Plaintiff.

95.     Defendants knew that, at all material times, that they were not providing the Plaintiff with the correct state of affairs of Bobe Holdings.

96.     Before KOPF entered into the Bobe Holdings Note, Defendants knew that their representations were false and fraudulent.

97.     This fraudulent behavior was independent of and outside the terms of the Bobe Holdings Note that was executed.

98.     Defendants knowingly, intentionally, and continuously made false representations to KOPF regarding the operations Bobe Holdings.

99.     Defendants did not disclose the facts that he materially misrepresented to Plaintiff and concealed the truth about the operations of Bobe Holdings as it pertains to its relationship with Sky Plus, Mr. Torres and Mr. Picker. Specifically, the Defendants lied about Bobe Holdings entering into any contract or agreement with a member or affiliate of a member of the Plaintiff in violation of Section 4.2(a)(2) of the LLCA.

100. The Defendants made these statements so that Plaintiff relied upon them, to its detriment, the Plaintiff relied upon them, and KOPF entered into the Bobe Holdings Note with the Co-Defendant Bobe Holdings and has, thereby, suffered damages.

101. There was a duty to disclose as per Section 4.2 of the LLCA.

102. As a direct and proximate result of the Defendants' fraudulent actions, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands judgment for damages against the Defendants, as well as attorney's fees and costs, and such other and further relief to which the Plaintiff may be entitled.

<u>**COUNT IV**</u>
<u>*DECLARATORY ACTION AGAINST ALL THE DEFENDANTS*</u>

Plaintiff realleges and reasserts all allegations set forth in Paragraphs 1 through 48, as if fully set forth herein.

46. This is an action for declaratory relief, pursuant to Chapter 86, Florida Statutes.

47. There is a bona fide dispute between the parties, wherein Plaintiff has initiated the instant action against the Defendants.

48. The Plaintiff, as the moving party, has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or as to some fact upon which the existence of such right, status, immunity, power or privilege does, or may depend. Particularly, a justiciable question as to whether the Bobe Holdings Note should be declared null and void by virtue of the Defendant's fraudulent misrepresentations and omissions as has been alleged herein.

49. Plaintiff is in doubt regarding its rights and seeks declaratory relief from this Court regarding the invalidity of the Bobe Holdings Note.

50. In accordance with Section 4.1 of the LLCA, Sky Plus, as Administrative Member of KOPF, had a duty to: (i) designate a Manager to conduct the day-to-day operations of KOPF,

23

and (ii) manage and conduct the operations and related contractual, financial, and other affairs of KOPF and make all decisions regarding KOPF, subject to Section 4.2 of the LLCA, wherein certain actions of KOPF required the approval of all of the Members, which for purposes of the LLCA were to be deemed Major Decisions. *See Exhibit "A," LLCA,* pp. 5-7.

51.      These Major Decisions included, but were not limited to the: (i) approval of the terms and conditions of any indebtedness incurred by KOPF for money borrowed by KOPF, (ii) approval of any contract or agreement between KOPF and a member or any affiliate of a member, other than as specifically permitted thereunder, (iii) action to create, incur, assume, refinance, extend, modify or otherwise become liable with respect to any obligation for borrowed money (including guarantees of the indebtedness or other obligations of any person or of any subsidiary or affiliate of KOPF) or issue any bonds, debentures, notes or other evidences of indebtedness, in any transaction or series of transactions, and/or the approval of a pledge, mortgage, hypothecation or encumbrance of the real estate projects, or any interest therein or any beneficial interest in KOPF. *See Exhibit "A," LLCA.*

52.      Pursuant to Section 4.8 of the LLCA, Sky Plus, in its capacity as Administrative Member of KOPF, appointed the Co-Defendant, Mr. Torres, as Manager of KOPF. *See Exhibit "A," LLCA,* p. 13. Specifically, Mr. Torres was tasked with the following:

> Section 4.8   Manager and Officers.   The Administrative Member may delegate the management and conduct of the Company's day-to-day business affairs to Managers or Officers of the Company, who may receive compensation for acting in such capacity.   Notwithstanding the foregoing, certain decisions or actions must in any event be expressly approved in advance by the Administrative Member before being undertaken by any Manager, Officer or other employee of the Company.   Such decisions and actions may be identified in written resolutions or policies adopted by the Administrative Member from time to time. The Administrative Member, the Managers and each Officer shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Officers, employees, or committees of the Company, or by any other Person as to matters the Administrative Member, Managers or Officers reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid.

*See Exhibit "A," LLCA,* p. 13.   Essentially, Mr. Torres had been delegated a duty to manage and conduct KOPF's day-to-day business affairs.

**WHEREFORE,** Plaintiff demands that this Court enter judgment against the Defendants granting Plaintiff the following relief: declaring its rights, powers, privileges, and/or immunities, as it relates to the invalidity of the Bobe Holdings Note.

## <u>COUNT V</u>
### *<u>BREACH OF CONTRACT AGAINST SKY PLUS AND MR. TORRES</u>*

Plaintiff realleges and reasserts all allegations set forth in Paragraphs 1 through 48, as if fully set forth herein.

103.   The Plaintiff and the Co-Defendant Sky Plus entered into the LLCA.

104.   As a result of the LLCA, KOPF entered into a transaction with AA Acquisitions, wherein KOPF executed a Promissory Note in favor of AA Acquisitions in the amount of $8,210,271.00.

105.   The AA Note had an option to extend its maturity date.   However, the option to extend the maturity date of the AA Note was never exercised by Mr. Torres.

106.    As a result of such failure to extend the maturity date of the AA Note, the AA Note matured, and the payment became due.

107.    In order to avoid a default of the AA Note by KOPF, the managers and members of KOPF authorized and approved for KOPF to enter into a revolving loan with Bobe Holdings in the amount of $9,000,000.00, the Bobe Holdings Note.

108.    In entering into the Bobe Holdings Note, Mr. Torres and Sky Plus materially misrepresented and concealed the truth about the operations of Bobe Holdings, which lured the parties to enter into the Bobe Holdings Note.

109.    Mr. Torres and Sky Plus materially misrepresented and concealed the truth about the operations of Bobe Holdings.

110.    Mr. Torres and Sky Plus materially misrepresented and concealed the fact that Bobe Holdings was a related party and an affiliate of Sky Plus.

111.    Mr. Torres and Sky Plus knew or should have been aware that prior to Plaintiff entering into the Bobe Holdings Note, the approval of all the Members as per Section 4.2(a)(2) of the LLCA was required. *See Exhibit "A," LLCA.*

112.    Specifically, Section 4.2(a)(2) of the LLCA provides that:

Section 4.2    Major Decisions.

(a)    The following actions shall require the approval of all the Members, and for all purposes hereunder be deemed to be Major Decisions ("**Major Decisions**"):

(1)    approval of the terms and conditions of any indebtedness incurred by the Company for money borrowed by the Company;

(2)    approval of any contract or agreement between the Company and a Member or any Affiliate of a Member other than as specifically permitted hereunder;

(3)    issuance or sale of additional Membership Interests or admission of a new member in the Company;

*See Exhibit "A," LLCA.*

113.    Here, Mr. Torres and Sky Plus had a duty to inform and obtain KOPF's approval of any "contract or agreement [entered] between [KOPF] and a Member or any Affiliate of a Member other than as specifically permitted hereunder."   *See Exhibit "A," LLCA.*

114.    As required by Section 4.2(a)(2) of the LLCA, Mr. Torres and Sky Plus failed to obtain this approval.

115.    Thereby, Mr. Torres and Sky Plus materially breached the LLCA, and failed to perform under the LLCA.

**WHEREFORE,** Plaintiff demands judgment for damages against Mr. Torres and Sky Plus together with interest, costs, and attorneys' fees, and such other and further relief as this Honorable Court finds just and proper.

Dated: September 20, 2023

By: */s/ John H. Ruiz*
John H. Ruiz, Esq.
Fla. Bar No. 928150
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Rd., 10th Floor
Miami, Florida 33134
Phone: (305) 614-2222
jruiz@msprecoverylawfirm.com
serve@msprecoverylawfirm.com

# EXHIBIT A

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## KOPF ACQUISITIONS, LLC

<u>Members</u>

SKYBRIDGE MIAMI, LLC, a Delaware limited liability company.

RIGI KOPF, LLC, a Florida limited liability company

<u>Date</u>

**[Insert Date]**

# TABLE OF CONTENTS

Page

ARTICLE 1 FORMATION AND OTHER ORGANIZATION MATTERS ................................... 1

    Section 1.1    Formation ................................................. 1
    Section 1.2    Basic Rights of Members ....................... 1
    Section 1.3    Name ........................................................ 2
    Section 1.4    Term ........................................................ 2
    Section 1.5    Business .................................................. 2
    Section 1.6    Principal Place of Business; Registered Office and Agent ......................... 2
    Section 1.7    Certain Definitions ................................ 2

ARTICLE 2 CONTRIBUTIONS BY MEMBERS; FINANCING .............................................. 2

    Section 2.1    Initial Capital Contributions .............. 2
    Section 2.2    Additional Capital Contributions ....... 2
    Section 2.3    Failure to Make Capital Contributions ............................................... 3
    Section 2.4    Deposit in Operating Account; Credit to Capital Account ............... 3
    Section 2.5    Return of or on Capital Contributions .............................................. 3
    Section 2.6    No Deficit Restoration ........................ 4

ARTICLE 3 DISTRIBUTIONS TO MEMBERS ...................................................................... 4

    Section 3.1    Distributions of Available Cash from Operations and Net Capital Transaction Proceeds ........................... 4

ARTICLE 4 POWERS, RIGHTS AND DUTIES OF MEMBERS. ........................................... 5

    Section 4.1    Authority of Members .......................... 5
    Section 4.2    Major Decisions. ................................... 5
    Section 4.3    Administrative Member ........................ 10
    Section 4.5    Liability of Members. ........................... 10
    Section 4.6    Indemnification ..................................... 11
    Section 4.7    Other Activities. ................................... 12
    Section 4.8    Operating Account. .............................. 13
    Section 4.9    Manager and Officers ......................... 13
    Section 4.10    Budgets. ................................................ 13

ARTICLE 5 STATUS OF MEMBERS ................................................................................... 13

    Section 5.1    Liability of Members .......................... 13
    Section 5.2    Bankruptcy or Dissolution of Member ............................................... 14
    Section 5.3    Access to Records ............................... 14
    Section 5.4    Relationship of Members .................... 14

ARTICLE 6 TRANSFER OF MEMBERSHIP INTERESTS ...................................................... 14

Section 6.1    General Restriction .................................................................................14
Section 6.2    Permitted Transfers..............................................................................14
Section 6.3    Transfer of Entire Interest ....................................................................15
Section 6.4    Effect of Assignment; Documents ........................................................15
Section 6.5    Substitute Member ...............................................................................15
Section 6.6    Further Requirements............................................................................15

ARTICLE 7 CERTAIN REMEDIES ...............................................................................17

Section 7.1    Litigation Without Termination ............................................................17
Section 7.2    Attorneys' Fees....................................................................................17
Section 7.3    Cumulative Remedies ..........................................................................17
Section 7.4    No Waiver ............................................................................................17

ARTICLE 8 DISSOLUTION OF COMPANY ................................................................17

Section 8.1    Events Resulting in Dissolution...........................................................18
Section 8.2    Procedure .............................................................................................18

ARTICLE 9 REPRESENTATIONS, WARRANTIES AND COVENANTS ...............18

Section 9.1    Member Representations ......................................................................18
Section 9.2    Confidentiality .....................................................................................20

ARTICLE 10 CERTAIN TAX AND ACCOUNTING MATTERS ...............................20

Section 10.1   Taxed as Partnership ...........................................................................20
Section 10.2   Tax Matters ..........................................................................................21
Section 10.3   Tax Returns Preparation ......................................................................21

ARTICLE 11 MISCELLANEOUS ..................................................................................21

Section 11.1   Notices .................................................................................................21
Section 11.2   Entire Agreement .................................................................................22
Section 11.3   Amendments.........................................................................................23
Section 11.4   Governing Law .....................................................................................23
Section 11.5   Jurisdiction; Choice of Forum .............................................................23
Section 11.6   WAIVER OF JURY TRIAL..................................................................23
Section 11.7   Successors and Assigns........................................................................23
Section 11.8   Captions ...............................................................................................23
Section 11.9   Severability ..........................................................................................23
Section 11.10  Email Signature....................................................................................23
Section 11.11  Counterparts..........................................................................................24
Section 11.12  Authorized Signatory ...........................................................................24
Section 11.13  Guaranties and Indemnities...................................................................24

## **EXHIBITS**

EXHIBIT A        Definitions
EXHIBIT B        Capital Accounts; Tax Allocations
EXHIBIT C        Preapproved Decisions and Actions
EXHIBIT D        The Property
EXHIBIT E        Representations and Warranties of RV Member

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### of
### KOPF ACQUISITIONS, LLC

#### Introduction

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (this "**Agreement**") is made as of May 26th 2020  (the "**Effective Date**"), by and between **Skybridge Miami, LLC**, a Delaware limited liability company (the "**Sky Plus Member**"), and RIGI KOPF, LLC, a Florida limited liability company (the "**RV Member**") each as a Member.  The address and principal place of business and telephone numbers of each Member are set forth in Section 11.1.  For good and valuable consideration, the receipt and adequacy of which are acknowledged, the Members agree to the following terms and conditions.

#### Recitals

A.    The Company has entered into an agreement to acquire the leasehold rights of the Property, which is intended to be developed as an aeronautical parcel.

B.    The Company was formed as limited liability company pursuant to and in accordance with the Florida Limited Liability Company Act by filing the Certificate of Formation with the Florida Division of Corporations on February 11, 2019.

C.    Sky Plus Member desires to make a Capital Contribution to the Company in exchange for being admitted as a Member.

D.    The parties hereto desire to enter into this Agreement to set forth herein the manner in which the Company will be governed and the respective rights, duties, obligations, responsibilities, and understandings of the Members and Manager with respect to conducting the affairs of the Company, all as of the Effective Date.

#### Terms and Conditions

### ARTICLE 1
### FORMATION AND OTHER ORGANIZATION MATTERS

Section 1.1    Formation.  The Company was formed as a limited liability company on February 11, 2019 by the filing of its Articles of Organization with the Florida Secretary of State pursuant to the Florida Act.

Section 1.2    Basic Rights of Members.  The Members hereby enter into this Agreement to set forth certain rights and obligations of the Members, the procedures for managing and operating the Company and related matters.  The Members intend and agree that this Agreement is for all purposes the "operating agreement" of the Company as defined in the Florida Act.

Except to the extent stated in this Agreement, (a) the rights and obligations (i) of the Company and its Members and (ii) among the Members and (b) the management, operation, termination and dissolution of the Company shall be governed by the provisions of the Florida Act.

Section 1.3   Name.   The business of the Company shall be conducted under the name **"KOPF Acquisitions, LLC"** or such other name as the Administrative Member may hereafter determine.

Section 1.4   Term.   The existence of the Company commenced on the date of filing its Articles of Organization and shall continue until terminated or dissolved pursuant to the terms of this Agreement.

Section 1.5   Business.   The business of the Company shall be to, among other things, directly or indirectly (including, without limitation, through one or more subsidiaries): (i) acquire certain rights on the Property under the Development Lease from the Lessee; (ii) develop, construct, market, operate, and lease the Property; and (iv) engage in any and all other general business activities incidental or reasonably related to the foregoing or otherwise permitted by law.  The Company is not authorized to and shall not engage in any business other than as described in this Section 1.5.

Section 1.6   Principal Place of Business; Registered Office and Agent.   The principal place of business of the Company shall be located at 2875 NE 191 Street, Suite 801, Aventura, FL 33180 or at such other location as shall be designated by the Administrative Member.  The registered office of the Company in the State of Florida shall be located at 2875 NE 191 Street, Suite 801, Aventura, FL 33180 and the registered agent for service of process on the Company at its registered office shall be Serber & Associates, P.A..

Section 1.7   Certain Definitions.   Certain capitalized and uncapitalized words and phrases used in this Agreement are defined in Exhibit A and shall have the meanings set forth therein.

## ARTICLE 2
## CONTRIBUTIONS BY MEMBERS; FINANCING

Section 2.1   Initial Capital Contributions.

(a)   The Members have contributed the following amounts to the capital of the Company as of the Effective Date:

    (1)   Sky Plus Member:    $3,000,000.00; and

    (2)   RV Member:    $2,000,000.00.

Section 2.2   Additional Capital Contributions.

(a)   Capital Call.   The Administrative Member shall provide written Notice to the Members requesting that they contribute additional capital to the Company, which Notice shall state the amount of the additional funds required.

(b)    Procedure for Funding Additional Capital.  The Members shall fund any Capital Contributions requested pursuant to this Section 2.2 *pro-rata* in proportion to their Percentage Interests.  Each Member shall be required to fund its share of such Capital Contributions within ten (10) Business Days from its receipt of Notice of each request for such Capital Contributions.

Section 2.3    Failure to Make Additional Capital Contributions.

(a)    If any Member (a "**Non-Contributing Member**") does not fund its share of any Additional Capital Contributions in accordance with Section 2.2 within the time specified (a "**Failed Contribution**"), the other Member which has funded its share of the Additional Capital Contributions in question (the "**Contributing Member**") may elect to treat its share of such Additional Capital Contribution as a Priority Capital Contribution (a "**Priority Capital Contribution**") to the Company (rather than a Capital Contribution) and to advance to the Company also as a Priority Capital Contributions an amount equal to the Failed Contribution.  If a Contributing Member makes a Priority Capital Contribution pursuant to this Section 2.3, then the Contributing Member shall receive distributions of the Priority Return and the Priority Capital Contribution as described in Section 3.1 before any other distributions are made to the Members.  Additionally, upon the occurrence of a Priority Capital Contribution, the Percentage Interest of the Contributing Member shall be increased by an amount equal to the percentage equivalent of a fraction, the numerator of which is equal to 150% of the Priority Capital Contribution and the denominator of which is equal to the aggregate amount of the Capital Contributions made by all Members through and including the date such Contributing Member contributed the Priority Capital Contribution.  The Percentage Interest of the Non-Contributing Member shall be reduced by the percentage by which the Contributing Member's Percentage Interest is increased pursuant to the preceding sentence.

(b)    In addition to the remedies set forth in Section 2.3(a), if, at any time, the Percentage Interest of a Non-Contributing Member is reduced below ten (10%) percent, then upon delivery of written notice to the Non-Contributing Member by the Contributing Member (i) all rights, powers, duties and obligations of the Non-Contributing Member under this Agreement shall be thereafter be exercisable exclusively by, or be the exclusive responsibility of, the Contributing Member, (ii) the Contributing Member shall have the right to terminate any agreement between the Company and the Non-Contributing Member or any Affiliate of the Non-Contributing Member, and (iii) the Non-Contributing Member shall no longer be entitled to initiate the Buy/Sell provisions set forth in Section 4.2(e).

Section 2.4    Credit to Capital Account. Each Capital Contribution by a Member to the Company pursuant to Section 2.1, 2.2 or 2.3 shall be credited to the Capital Account of that Member as of the date such Capital Contribution is received by the Company from the Member.

Section 2.5    Return of or on Capital Contributions.  Except as expressly provided in this Agreement, (a) no Member shall receive any return or distribution of its Capital Contributions, (b) no Member shall receive any interest or other return on or with respect to its Capital Contributions and (c) no Member shall be entitled to withdraw any part of its Capital Contributions.

Section 2.6    No Deficit Restoration.  No Member shall have any Obligation to restore any deficit in its Capital Account.  No allocation to any Member of any loss or deduction, whether attributable to depreciation or otherwise, shall create any Obligation of that Member to the Company or any other Member, even if the allocation reduces such Member's Capital Account or creates or increases a deficit in its Capital Account.  The Members intend and agree that no Member shall be obligated to pay any deficit in its Capital Account to or for the account of the Company or any creditor of the Company.

**ARTICLE 3**
**DISTRIBUTIONS TO MEMBERS**

Section 3.1    Distributions of Available Cash from Operations and Net Capital Transaction Proceeds.

(a)    Timing.  Distributions of Available Cash from Operations shall be made at such times as the Administrative Member shall determine.  Distributions of Net Capital Transaction Proceeds shall be made as soon as reasonably practicable following the Company's receipt thereof.

(b)    General Priority Rules.  All distributions of Available Cash from Operations and Net Capital Transaction Proceeds shall be made in the order of priority shown in subsection (c).  The Members identified at each level of priority shall receive distributions at the same time without preference or priority of one Member over another until all Members at that level have received the full amount to which they are entitled and before any distributions are made or paid to any Members for amounts in a lower level of priority.  If distributions pursuant to any level of priority in subsection (c) below where more than one Member is entitled to distributions are not sufficient to pay each Member the full amount to which it is entitled, distributions pursuant to such priority levels shall be made to each Member on a *pro rata* basis in the same ratio that the amount owed to such Member pursuant to that priority level bears to the amount owed to all Members at that priority level.

(c)    Specific Payment Priorities.  All distributions shall be made in the following order of priority:

(1)    first, to all Members who have made Priority Capital Contributions pursuant to Section 2.3(a) pro rata in proportion to the amount of the Priority Return owed to each Member, until each Member has been paid in full an amount equal to the Priority Return on the amount of its Priority Capital Contributions;

(2)    second, to all Members who have made Priority Capital Contributions pursuant to Section 2.3(a) pro rata in proportion to the amount of the Priority Capital Contribution owed to each Member, until each Member has been paid in full an amount equal to all of its Priority Capital Contributions;

(3)    third, to the Members in proportion to and to the extent of their Unreturned Capital until their Unreturned Capital is reduced to zero; and

(4)     thereafter, to the Members *pro rata* in accordance with their respective Percentage Interest.

(d)     <u>Distributions in an Event of Default.</u> Notwithstanding the foregoing, no distributions of Available Cash from Operations and Net Capital Transaction Proceeds shall be made to the RV Member if an Event of Default has occurred unless and until the Sky Plus Member has been fully indemnified for any Losses caused by or resulting from or arising out of a breach of RV Member's representations or warranties contained herein. Additionally, all distributions which would correspond to the RV Member may be applied to compensate the Sky Plus Member for its Losses.

## ARTICLE 4
## POWERS, RIGHTS AND DUTIES OF MEMBERS.

Section 4.1     <u>Authority of Members</u>.    Subject to <u>Section 4.2</u>, the Administrative Members shall (i) designate a Manager to conduct the day-to-day operations of the Company and (ii) manage and conduct the operations and related contractual, financial and other affairs of the Company and make all decisions regarding the Company.

Section 4.2     <u>Major Decisions</u>.

(a)     The following actions shall require the approval of all the Members, and for all purposes hereunder be deemed to be Major Decisions ("**Major Decisions**"):

(1)     approval of the terms and conditions of any indebtedness incurred by the Company for money borrowed by the Company;

(2)     approval of any contract or agreement between the Company and a Member or any Affiliate of a Member other than as specifically permitted hereunder;

(3)     issuance or sale of additional Membership Interests or admission of a new member in the Company;

(4)     filing or commencement of any Bankruptcy Proceeding by or on behalf of the Company; consenting to the institution or continuation of any involuntary Bankruptcy Proceeding against the Company or the conversion of an involuntary proceeding into a voluntary proceeding; the admission in writing by the Company of its inability to pay its debts generally as they become due; or the making by the Company of a general assignment for the benefit of its creditors;

(5)     approval of any material modification or amendment to this Agreement;

(6)     approval of an Annual Budget as well as updating, supplementing, amending or revising, or deviating from an Annual Budget if such changes are in excess of $100,000.00 for any line item or any aggregate annual change of $500,000.00;

(7)     any material action in contravention of this Agreement;

(8)    knowing performance of any act that would subject any Member to liability beyond those described in this Agreement or the Florida Act;

(9)    authorization or entering into any agreement, commitment or other transaction with a Person which would dilute the Percentage Interest owned by a Member in a manner which is disproportionate to the dilution which would occur to any other Member;

(10)    lending funds of the Company or engaging in any other extension of credit by the Company to any Person or obligating the Company or a Member as a surety, guarantor or accommodation party to any obligation of the Company or of any Third Party or otherwise providing any guarantees or indemnities of the Company;

(11)    approval of a sale, exchange, conveyance, or other disposition (whether by merger, consolidation, conversion, liquidation, or otherwise) of the Company assets;

(12)    action to create, incur, assume, refinance, extend, modify or otherwise become liable with respect to any obligation for borrowed money (including guarantees of the indebtedness or other obligations of any Person or of any subsidiary or Affiliate of the Company) or issue any bonds, debentures, notes or other evidences of indebtedness, in any transaction or series of transactions, and/or the approval of a pledge, mortgage, hypothecation or encumbrance of the real estate projects, or any interest therein or any beneficial interest in the Company;

(13)    approval of the issuance, redemption or purchase by the Company of any Membership Interests;

(14)    acquisition of any real or personal property to the extent not provided for in any Budget;

(15)    take any action that may affect or alter the federal income tax treatment of the Company or its Members.

(16)    adopting accounting principles, accounting methods and other non-routine accounting matters or approve the Company's financial statements;

(17)    take any action regarding the merger or consolidation of the Company, whether or not the Company is the surviving entity;

(18)    dissolution of winding up of the Company;

(19)    commingling funds of the Company with those of any other Person;

(20)    changing the Company's business or Company purpose, or causing or permitting the Company to engage in any business or activity unrelated to the purposes of the Company described in Section 1.5; and

(21)    any action regarding the adoption, amendment or repeal of any Article of the Articles of Organization or this Agreement;

(b)    Approval Process.  Each Member may propose to adopt, modify or revoke a Major Decision at any time by delivering written Notice (a "**Major Decision Notice**") to the other Members describing the proposal.  Each Member shall promptly consider and evaluate each proposal to adopt, modify or revoke a Major Decision and shall promptly give its decision (set forth in writing).  The Parties expressly acknowledge that any approval of a proposed Major Decision is subject to the standards stated in Section 5.4.  If a Member disapproves a Major Decision, it shall briefly state in a written Notice to the other Member the specific reasons for its disapproval and, to the extent appropriate, the changes in the proposed Major Decision that would make it acceptable.  A Major Decision shall be deemed rejected unless or until such Major Decision has been approved in writing by all of the Members.  Subject to subsection (d) below, if a Member fails to respond to a Major Decision Notice within five (5) days, such Member shall be deemed to have rejected the proposed Major Decision.

(c)    Notwithstanding the foregoing, if at any time, the Percentage Interest of a Member is reduced below twenty five (25%) percent (the "**Minority Member**"), the Members be unable to agree upon a Major Decision, then other Member (the "**Majority Member**") may elect, by written notice to the Minority Member, for the Majority Member's position regarding the Major Decision to be authorized and approved by the Company as if the Minority Member and the Majority Member had agreed upon such Major Decision, and the same will be implemented accordingly; provided, however, that Majority Member shall not unilaterally effect a Major Decision that causes the Minority Member to be disproportionately negatively affected.

(d)    Preapproved Decisions and Actions.  Notwithstanding any other provision in this Agreement to the contrary, the Members have already agreed that the Company and the Members shall take those actions described in the attached Exhibit C.  The Company, and the Members shall sign such documents, vote their Membership Interests, give such approvals and take such other actions, as applicable, as shall be appropriate or necessary to implement the actions described in Exhibit C.

(e)    Buy/Sell.  If the Members have reached a deadlock with respect to a Major Decision and the Majority Member's position has been authorized and approved by the Company as if the Minority Member and the Majority Member had agreed upon such Major Decision, as set forth under Section 4.2(c) above, on three (3) separate instances, then the Minority Member shall have the right to initiate a buy-sell process set forth under this Section 4.2(e).

(1)    Notice.  The Minority Member shall have the right (such Member, the "**Offering Member**"), exercisable within thirty (30) days after the creation of said deadlock to serve a notice (a "**Buy-Out Notice**") on the Majority Member (the "**Offeree Member**") setting forth the Offering Member's desire to purchase the entire Company Interest of the Offeree Member. The Buy-Out Notice shall contain a stated amount (the "**Buy-Sell Price**") at which the Offering Member would purchase all of the assets of the Company as if such assets were free and clear of all liens, claims and encumbrances. The Buy-Out Notice shall also include a statement of the other major economic terms and

7

conditions upon which the Offering Member would be willing to purchase from the Offeree Member its Company Interest including its interest in any Priority Capital Contributions, as well as a closing date of not less than ninety (90) days from the date of the Buy-Out Notice (and in such case, under the circumstances described below, those terms and conditions shall also apply to the sale by the Offering Member to the Offeree Member of its Company Interest). A copy of the Buy-Out Notice shall be delivered to an independent accounting firm mutually selected promptly upon the need for same and in good faith by the Offering Member and the Offeree Member who shall, within fifteen (15) days, determine and notify the Members as to the amount the Offeree Member would receive (the "**Offeree Value**") and the amount the Offering Member would receive (the "**Offeror Value**") on account of its Company Interest and any Priority Capital Contributions made by such Member to the Company if all Company assets were sold for the Buy-Sell Price, all liabilities of the Company (other than the Priority Capital Contributions) were paid in full, and the remaining proceeds distributed to the Members in accordance with Section 3.1. Within ten (10) days of receipt of the notice from the accountants setting forth the Offeree Value, the Offering Member shall deliver a deposit check of the Offering Member payable to the direct order of the Offeree Member's counsel, as escrow agent, in an amount equal to ten percent (10%) of the Offeree Value, and the Offeree Member shall be entitled to deliver such check to its counsel who shall promptly deposit the same in its escrow account and shall hold such deposit pursuant to an escrow agreement to be entered into among the Offeree Member, the Offering Member and such counsel. The Offer Deposit shall become nonrefundable upon delivery to the Offeree Member's counsel, unless the Offeree Member elects to purchase the entire Company Interest owned by the Offeror, in which case the Offer Deposit shall be returned to the Offeror upon the delivery of the Election Notice.

     (2)   Election. The Offeree Member shall have forty-five (45) days from receipt of the Buy-Out Notice (the "**Acceptance Period**") in which to give written notice ("**Election Notice**") to the Offering Member electing either (i) to sell to the Offering Member all of the Offeree Member's right, title and interest in and to its Company Interest for a cash purchase price equal to the Offeree Value or (ii) to purchase all of the Offering Member's right, title and interest in and to its Company Interest for a cash purchase price equal to the Offeror Value, and in which case the Election Notice shall be accompanied by a deposit check of the Offeree Member payable to the direct order of the Offering Member's counsel, as escrow agent, in an amount equal to ten percent (10%) of the Offering Value, and the Offering Member shall be entitled to deliver such check to its counsel who shall promptly deposit the same in its escrow account and shall hold such deposit pursuant to an escrow agreement to be entered into among the Offeree Member, the Offering Member and such counsel. The Offer Deposit shall become nonrefundable upon delivery to the Offering Member's counsel. If the Offeree Member elects clause (ii), the Election Notice shall set a date, not earlier than thirty (30) days and not later than ninety (90) days from the date of the Election Notice, on which the closing of such purchase and sale shall be held. Failure to give the Election Notice within the Acceptance Period shall be deemed an acceptance by the Offeree Member of the Offering Member's offer to purchase the Offeree Member's Company Interest for the Offeree Value and the Offeree Member's agreement that the closing of such purchase and sale shall take place at the principal offices of the Company on the closing date set forth in the Buy-Out Notice.

Either the Offering Member or the Offeree Member shall be entitled to enforce its rights under this Section 4.2(e) by specific performance. If the purchaser defaults under this Section 4.2(e), the seller may elect to either (i) retain the deposit as liquidated damages for the purchaser's failure to close, in which case another Buy-Sell process cannot be triggered until the next deadlock with respect to a Major Decision that takes place at least twelve (12) months after such default, or (ii) elect by notice to the purchaser within thirty (30) days thereafter to purchase the purchaser's Company Interest by paying an amount equal to ninety percent (90%) of the Offeree Value or the Offeror Value, as the case may be.

 (3) <u>Closing</u>.

  (i) <u>Time and Location</u>. The closing of the purchase and sale of a Company Interest or portion thereof as provided under this Section 4.2(e) shall take place at the principal offices of the Company at any time during its ordinary; business hours on, as the case may be, such date as is specified in the Election Notice, or such other date as may be mutually agreed upon by the Members.

  (ii) <u>Terms. At the Closing</u>:

   1) the transferor Member shall (at its sale expense) transfer the Company Interest to the transferee free and clear of all liens and encumbrances other than the restrictions under this Agreement;

   2) the transferee Member shall pay to the transferor Member, pursuant to the terms set forth in the Buy-Out Notice, or on such terms as may be agreed upon by the transferor Member and the transferee, the purchase price for the Company Interest being Transferred by such transferee (against which amount the deposit, which shall be transferred to the transferor Member, shall be credited);

   3) the transferor Member and the transferee Member shall execute and deliver to each other any documents necessary to carry out their respective undertakings hereunder;

   4) the transferee Member shall deliver to the transferor Member a specific release of the transferor Member and/or any Affiliates of the transferor Member from the primary liability (as opposed to continuing liabilities, such as environmental liabilities, which can not be released) to any institutional lenders having outstanding loans to the Company (including the cancellation and return of all guarantees, letters of credit, and other security or assurances posted or made by the transferor Member or any Affiliates of the transferor Member, or principal of the transferor Member). The Members and their Affiliates shall cooperate in good faith to effectuate said release. The Company Interest shall be transferred free and clear of all encumbrances except for the liabilities being assumed or taken subject to pursuant to this Section.

(4)    Notwithstanding anything to the contrary contained in this Section 4.2(e), the rights of the "transferee" (i.e., the purchaser) Member may be assigned by the transferee Member to such designee as it determines in its sole and absolute discretion. The transferee Member shall remain liable for all acts to be taken by said designee until one hundred percent (100%) of the consideration payable to the transferor Member pursuant to this Section 4.2(e) has been paid in full.

Section 4.3    Administrative Member.

(a)    Appointment.  The Members hereby appoint the Sky Plus Member as the initial Administrative Member of the Company.  The Sky Plus Member hereby agrees to serve in that capacity pursuant to the terms and conditions of this Agreement.

(b)    Duties of Administrative Member.  The Administrative Member agrees that, in addition to any obligations and responsibilities set forth elsewhere in this Agreement, the Administrative Member shall distribute to the Members all operating, financial and other reports and statements and all other documents and notices received by the Company or the Administrative Member, at the expense of the Company.

(c)    Expenses.  The Company shall reimburse the Administrative Member for all reasonable amounts expended on behalf of the Company.

(d)    Resignation.  Unless otherwise consented to by the Members, the Administrative Member then serving may not voluntarily resign without giving at least sixty (60) days prior written Notice to the Members. Upon such resignation, all the Members shall appoint a new Administrative Member.

(e)    Removal of Administrative Member.  In the event that the Sky Plus Member, as the Administrative Member knowingly takes any action (or omission) which constitutes fraud, malfeasance, gross negligence or willful misconduct (after written notice and an opportunity to cure; provided, however, that the cost of such cure shall be at the Administrative Member's expense and the period to cure shall not exceed 30 days unless the matter in question requires a period in excess of 30 days to cure, in which case the Administrative Member shall have such longer period, as long as the Administrative Member commences such cure within such 30 day period and thereafter continues to diligently pursue such cure to completion in good faith) then, in such event, the RV Member shall have the right (by giving the Sky Plus Member written notice at least ten (10) days prior to the effective date of such removal) to remove the Sky Plus Member as the Administrative Member of the Company.  Upon the Sky Plus Member's removal as the Administrative Member of the Company, the RV Member, or its designee, shall become, for all purposes of this Agreement, the Administrative Member.

Section 4.4    Liability of Members.  No Member or Affiliate shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on such Member by this Agreement or by law unless such action or omission was performed or omitted in bad faith or constituted gross negligence, willful misconduct or a breach of fiduciary duty.

Section 4.5

(a)      Indemnification by Company.  The Company as Indemnitor shall, subject to the limitations stated below and those set forth in Section 4.5(d), indemnify, defend and hold harmless each Member and its Affiliates as Indemnitees to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from or arising out of the participation by any Indemnitee in the activities of the Company as Members.  The Indemnitor shall be required to indemnify the Indemnitee pursuant to this Section only if (1) the Indemnitee acted in good faith, in a manner required or permitted by the terms of this Agreement, (2) the Indemnitee is not obligated to indemnify the Company, other Members or their Affiliates against Losses arising out of the same action or inaction pursuant to Section 4.6(b), and (3) with respect to any criminal action or proceeding, the Indemnitee did not have reasonable cause to believe that its conduct was unlawful.  The termination of a lawsuit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that an Indemnitee did not meet those standards.  Any indemnification by the Company permitted under this Section shall be made solely out of the assets of the Company.  No Member shall be obligated to make any Capital Contributions or loans to the Company to enable the Company to provide such indemnification.

(b)      Indemnification by Member.  Subject to Sections 4.5(a) and (f), each Member as Indemnitor shall indemnify, defend and hold harmless the Company and each other Member and its Affiliates as Indemnitees to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from or arising out of (i) Losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) incurred as a result of the violation, default or breach by the Indemnitor of this Agreement; (ii) the fraud, intentional violation of law, willful or intentional misconduct or gross negligence of the Indemnitor or any of its Affiliates that causes the Company to breach or default under any indebtedness of the Company or any other agreement to which the Company is a party (each of the foregoing in this Section 4.5(b) referred to herein as a "**Bad Act**").

(c)      Indemnification by RV Member.  RV Member shall indemnify, release and hold harmless, to the fullest extent permitted by law, the Company, and Sky Plus Member and its successors and permitted assigns from and against any Losses caused by or resulting from or arising out of a breach of RV Member's representations or warranties contained herein.

(d)      Right of Contribution.  Subject to Sections 4.5(a) and (f), each Member as Indemnitor shall indemnify, defend and hold harmless the Company and each other Member and its Affiliates as Indemnitees to the fullest extent permitted by applicable law against any Loss of the Indemnitees to the extent that the aggregate Loss incurred by such Indemnitees exceeds their proportionate share (as determined by reference to Percentage Interest of the Member that is an Indemnitee or an Affiliate of an Indemnitee) of the aggregate Loss incurred by all of the Members and their Affiliates (i.e., a right of contribution to the extent that any Member and its Affiliates incur a disproportionate share of any Loss).  Notwithstanding the foregoing, no Member shall be entitled to any right of contribution as described in this Section 4.5(d) with respect to any matter related to a Bad Act that was committed by such Member or one of its Affiliates.

11

(e)     Indemnification by Transferring Member.  Any Member that Transfers all or any portion of its Membership Interest and any principal who Transfers all or any part of its ownership or other interests in a Member shall in each case as Indemnitor indemnify, defend and hold harmless the Company, each other Member and their Affiliates as Indemnitees to the fullest extent permitted by applicable law against all Losses of those Indemnitees caused by, resulting from or arising out of (i) any failure by the Indemnitor to comply with any federal, state, local or foreign securities, antitrust or other laws or regulations applicable to such Transfer (including those relating to payment of transfer taxes) or (ii) any breach, default or violation of any financing or any future financing caused by or attributable to such Transfer.

(f)     Limitations on Indemnification.  No Indemnitor shall be obligated to indemnify an Indemnitee pursuant to this Article to the extent that  (1) the Indemnitee has committed by way of action or omission any fraud, intentional violation of law, gross negligence, or willful misconduct with regard to the matter for which indemnification is sought, (2) the Losses to the Indemnitee were caused by, resulted from or arose out of a breach, default or violation by the Indemnitee of this Agreement and the breach, default or violation was intentional, willful or grossly negligent, or (3) the Loss to the Indemnitee was caused by or resulted from or arose out of any of its Affiliates taking any action or causing any event described in clauses (1) or (2) above.

(g)     Insurance.  The Members may cause the Company to purchase and maintain insurance on behalf of any Indemnitee.  If insurance is obtained for any Indemnitee, it shall be obtained on the same basis for all other Indemnitees who have comparable risks.

(h)     Survival of Indemnification Obligations.  The indemnification obligations under this Article shall survive the Transfer of Membership Interests by any Member or the dissolution of the Company

Section 4.6     Other Activities.  Affiliates of the Members may have other business interests and may engage in other activities in addition to those relating to the Company, including the making or management of other investments (debt and equity), or operation of cargo inspection programs at other locations.  Each Member recognizes that Affiliates of the Members have an interest in investing in, owning, operating, transferring, leasing and otherwise using real property and interests therein for profit, and engaging in any and all related or incidental activities and that each will make other investments consistent with such interests and the requirements of any agreement to which they or their Affiliates are a party.  In furtherance of the foregoing: (a) neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to any other ventures or activities in which any Member or Affiliates of any Member are involved or to the income or proceeds derived from those ventures or activities; (b) the pursuit of other ventures and activities by any Member or Affiliates of any Member, even if competitive with the business of the Company, is hereby consented to by all other Members and shall not be deemed wrongful or improper under this Agreement or applicable law; and (c) no Affiliate of a Member shall be obligated to present any particular investment opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each such Affiliate shall have the right to take for its own account, or to recommend to others, any such particular

investment opportunity and no provision in this Agreement shall limit or restrict in any manner whatsoever the activities of any Member and any Affiliate.

Section 4.7    Operating Account.   At such time as determined by the Administrative Member, the Company shall establish an account (the "**Operating Account**") with a depository institution.  Through the use of signature cards, authorized representatives of the Administrative Member shall have access to the Operating Account and its contents.  The Operating Account shall be solely in the name of the Company and in no event shall the Operating Account be commingled with any accounts of the Administrative Member or any other Person. Notwithstanding any other provision herein, the Administrative Member shall not employ the funds in the Operating Account in any manner except for the benefit of the Company and as permitted under the terms of this Agreement.

Section 4.8    Manager and Officers.   The Administrative Member may delegate the management and conduct of the Company's day-to-day business affairs to Managers or Officers of the Company, who may receive compensation for acting in such capacity.  Notwithstanding the foregoing, certain decisions or actions must in any event be expressly approved in advance by the Administrative Member before being undertaken by any Manager, Officer or other employee of the Company.  Such decisions and actions may be identified in written resolutions or policies adopted by the Administrative Member from time to time. The Administrative Member, the Managers and each Officer shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Officers, employees, or committees of the Company, or by any other Person as to matters the Administrative Member, Managers or Officers reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid.

Section 4.9    Annual Budgets.   Each year, the Administrative Member shall prepare an annual budget for the operation of the Company (each an "**Annual Budget**").   The proposed Annual Budget shall be submitted by the Administrative Member to the other Member, and the other Member shall notify the Administrative Member in writing within ten (10) days of its receipt thereof (i) that it approves the proposed Annual Budget or (ii) the revisions the other Member believes should be made to such proposed Annual Budget (in which event, the other Member shall specify in reasonable detail in its response which portions of the proposed Annual Budget it disapproves and the reasons therefor).   The Administrative Member and the other Member shall discuss in good faith all revisions suggested by the other Member.  If the other Member fails to respond within such ten (10) day period, the other Member shall be deemed to have approved the proposed Annual Budget.

### ARTICLE 5
### STATUS OF MEMBERS

Section 5.1    Liability of Members.   No Member shall have any personal liability whatsoever, whether to the Company, to the other Members or to the creditors of the Company,

for the debts of the Company or any of its Losses.  The foregoing shall not, however, limit the personal liability of a Member for its obligations to the Company under this Agreement or to the Company or any other Member under any other agreement to which such Member may be a party.

Section 5.2    Bankruptcy or Dissolution of Member.  The bankruptcy, insolvency or dissolution of a Member or any of their respective Affiliates shall not cause a dissolution of the Company, but the rights of such Member to share in the profits and losses of the Company and to receive distributions of Company funds shall, on the happening of such an event, devolve upon its trustee or successor, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  The successor of such Member shall be liable for all of the obligations of such Member under this Agreement.  However, in no event shall such trustee or successor become a substitute Member, except with the prior written consent of the Members.

Section 5.3    Access to Records.  Each Member shall, upon reasonable notice to the Administrative Member, be provided with access to all tax, financial and other books and records of the Company.

Section 5.4    Relationship of Members.  Each Member agrees that, to the fullest extent permitted by the Florida Act and except to the extent expressly stated in this Agreement:

(a)    No Member shall have any fiduciary or other implied duty, responsibility or obligation of loyalty, care, good faith or fair dealing to the Company or any other Member.

(b)    Any consent, approval of a Major Decision, determination or other action by a Member shall be given, taken, or withheld in the reasonable discretion of that Member unless stated to the contrary.

## ARTICLE 6
## TRANSFER OF MEMBERSHIP INTERESTS

Section 6.1    General Restriction.  Except for Permitted Transfers pursuant to Section 6.2, no Member may Transfer all or part of a Membership Interest in the Company or of any direct or indirect ownership or other economic, profits, voting or other equity interest of any kind in a Member or any constituent shareholder, member or partner thereof, without the prior written consent of the non-transferring Member and until all requirements and conditions stated in this Article, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member. Any Transfer in violation of this Article shall be invalid, ineffective and not enforceable for any purpose.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

Section 6.2    Permitted Transfers.

(a)    Transfers of Membership Interest.  Each Member may at any time, without the consent or approval of any other Member, Transfer all, but not less than all, of its Membership Interests to (1) a Controlled Affiliate of such transferring Member or (2) the other Members

pursuant to this Agreement or through any other direct agreement with a Member or an Affiliate thereof.

(b)     Transfers of Interest in a Member.   The direct and indirect interests in each Member may at any time, without the consent or approval of any other Member, be Transferred to  (1) a Controlled Affiliate of such transferring Member or (2) any Person; provided that following such Transfer one or more Controlled Affiliates of the transferring Member control the transferring Member and, directly or indirectly, own at least fifty-one percent (51%) of the interests in the transferring Member.

Section 6.3     Transfer of Entire Interest.   Upon the Transfer of its entire Membership Interest in the Company and the admission of such Member's transferee(s) as a substitute Member pursuant to Section 6.5, a Member shall be deemed to have withdrawn from the Company.

Section 6.4     Effect of Assignment; Documents.   In the event of any sale, assignment or transfer permitted hereunder, the Company shall not be dissolved or wound up, but shall continue.   No such sale, assignment or transfer shall relieve the assignor from any of its obligations under this Agreement accruing prior to such sale, assignment or transfer. Notwithstanding the foregoing, as a condition to any sale, transfer or assignment by a Member of its Membership Interest, the transferee or assignee must execute this Agreement and agree to be bound by all of its terms and provisions.

Section 6.5     Substitute Member.   The transferee of a Membership Interest shall be admitted to the Company as a substitute Member, but only if such Transfer is made in compliance with Sections 6.1, 6.2 and 6.6.   Unless a transferee of a Membership Interest is admitted as a substitute Member under this Section 6.5, it shall have none of the powers of a Member hereunder and shall have only such rights of an assignee under the Florida Act as are consistent with the other terms and provisions of this Agreement.

Section 6.6     Further Requirements.   In addition to the other requirements of Sections 6.1, 6.2 and 6.5, and unless waived or modified in whole or in part by the non-transferring Members, no Transfer of all or any portion of a Membership Interest may be made unless the following conditions are met:

(a)     The delivery to the Company of a fully executed copy of all transfer documents relating to the Transfer, including (1) an instrument of transfer, and (2) the agreement in writing of the transferee to (x) be bound by the terms of this Agreement, including the making of all of the representations and warranties hereunder and (y) pay all actual out-of-pocket costs and expenses of the Company incident to the Transfer.

(b)  ·   The representation of the transferring Member and the transferee, and the delivery of an opinion of counsel reasonably acceptable to the non-transferring Members, that (1) the Transfer will not cause the Company to be treated as an association taxable as a corporation for Federal income tax purposes, (2) the Transfer will not cause the Company to be treated as a "publicly traded Company" within the meaning of Section 7704 of the Code, (3) the Transfer will not violate the Securities Act of 1933, as amended (the "**Securities Act**"), the Securities

Exchange Act of 1934, as amended or any other applicable Federal or state securities laws, rules or regulations and (4) the transferee is either non-U.S. investor or a U.S. "accredited investor" within the meaning of Rule 501 of Regulation D adopted by the Securities and Exchange Commission.

Section 6.7    Right of First Refusal. Subject to the other provisions of this Article XI, in the event that any Member (the "**Selling Member**") receives a Bona Fide Offer (as hereinafter defined) to purchase all or any portion of the Selling Member's Membership Interest and the Selling Member wishes to accept such Bona Fide Offer, the Selling Member shall give written notice (the "**Seller's Notice**") to the other Member (the "**Remaining Member**"), which notice shall contain the terms of the Bona Fide Offer, including the name of the Person who proposes to purchase the Selling Member's Membership Interest (the "**Proposed Purchaser**"), and shall also include a copy of the terms of such Bona Fide Offer.  For purposes of this Agreement, the term "Bona Fide Offer" shall mean an offer in writing from a party unrelated to and not an Affiliate of any existing Member or Assignee (who must be financially capable of carrying out the terms of the Bona Fide Offer), in a form legally enforceable against the Proposed Purchaser; provided, however, the consideration for the Selling Member's Membership Interest must be in the form of cash and/or a promissory note payable by the Proposed Purchaser.

(a)    The Remaining Member shall have the right to purchase all of the Membership Interest of the Selling Member that is the subject of the Bona Fide Offer (the "**Subject Membership Interest**") on the same terms and conditions as those set forth in the Bona Fide Offer (the "**Right of First Refusal**"). The Right of First Refusal shall extend for a period of fifteen (15) days from the date that the Seller's Notice is received by the Remaining Member (the "**Exercise Period**").  If the Remaining Member elects to purchase the Selling Member's Membership Interest, then such Remaining Member shall send written notice of such intention, setting forth that it shall purchase the Selling Member's Membership Interest, to the Selling Member before expiration of the Exercise Period.

(b)    In the event the Remaining Member shall elect to purchase all of the Subject Membership Interest, a closing shall be held before the latest to occur of: (i) the expiration of the thirty (30) day period following the receipt by the Selling Party of notice that the Remaining Member has elected to exercise the Right of First Refusal, or (ii) the date of closing specified in the Bona Fide Offer.  Such closing shall be on the terms and other provisions of the Bona Fide Offer.

(c)    In the event the Remaining Member does not purchase all of the Selling Party's Membership Interest pursuant to this Section 6.7, then the Selling Member may sell to the Proposed Purchaser, on the terms specified in the Bona Fide Offer, all of the Subject Membership Interest; provided, however, that the Proposed Purchaser shall agree to be bound by and subject to all of the terms of this Agreement.  If, however, the sale to the Proposed Purchaser is not consummated pursuant to the terms and conditions contained in the Bona Fide Offer within the lesser of (i) one hundred eighty (180) days after the date that the Seller's Notice is received or (ii) the period of time specified by the Bona Fide Offer, then the rights of first refusal set forth this Section 6.7 shall again be effective.

## ARTICLE 7
## CERTAIN REMEDIES

Section 7.1    <u>Litigation Without Termination</u>.    Each Member shall be entitled to maintain, on its own behalf or on behalf of the Company, any action or proceeding against any other Member or the Company (including,  any action for damages, specific performance or declaratory relief) for or by reason of the breach by such party of this Agreement or any other agreement entered into in connection with this Agreement, notwithstanding the fact that any or all of the parties to such proceeding may then be Members in the Company, and without dissolving the Company as a limited liability company.

Section 7.2    <u>Attorneys' Fees</u>.  If the Company or any Member obtains a judgment or arbitration decision against any other Member by reason of breach of this Agreement or failure to comply with the provisions hereof, a reasonable attorneys' fee as fixed by the court or arbitrator shall be included in such judgment or arbitration decision.

Section 7.3    <u>Cumulative Remedies</u>.    Except to the extent expressly stated in this Agreement, (a) no remedy conferred upon the Company or any Party pursuant to this Agreement is intended to be exclusive of any other remedy available under this Agreement or applicable law and (b) each remedy shall be cumulative and shall be in addition to every other remedy available under this Agreement or applicable law now or in the future.

Section 7.4    <u>No Waiver</u>.  No waiver by a Party or the Company of any default, breach or violation of this Agreement shall be deemed to be a waiver of any other default, breach or violation of any kind or nature, whether or not similar to the default, breach or violation that has been waived or failure to enforce a particular provision in one instance shall not be deemed a waiver or modification of rights or preclude the enforcement thereafter.  No acceptance of payment or performance by a Party or the Company after any such default, breach or violation shall be deemed to be a waiver of any default, breach or violation of this Agreement, whether or not such Party or the Company knows of such default, breach or violation at the time it accepts such payment or performance.  Subject to any applicable statutes of limitation, no failure or delay on the part of a Party or the Company to exercise any right it may have under this Agreement shall prevent its exercise by such Party or the Company, and no such failure or delay shall operate as a waiver of any default, breach or violation of this Agreement.

Section 7.5    <u>Remedies After an Event of Default.</u> If an Event of Default shall occur, then in addition to all other remedies herein and at law or in equity:

(a)    the RV Member shall lose all consent, approval and voting rights under this Agreement; and

(b)    the Sky Plus Member shall have the right to collect from the RV Member (or the Company's distributions corresponding to the RV Member) any and all costs, expenses or losses (including legal fees and expenses and other fees) incurred by the Sky Plus Member as a result of the Event of Default.

## ARTICLE 8
## DISSOLUTION OF COMPANY

17

Section 8.1   <u>Events Resulting in Dissolution</u>.  The Company shall dissolve pursuant to the Florida Act only if one or more of the following events occur:

(a)      The unanimous agreement in writing by the Members to dissolve the Company;

(b)      The voluntary or involuntary dissolution of all of the Members; or

(c)      Any other event that requires the Company's dissolution under the Florida Act.

Section 8.2   <u>Procedure</u>.

(a)      Upon the dissolution of the Company, the Members shall wind up the affairs of the Company.  The Members shall continue to receive allocations of Net Income and Net Losses and distributions of Available Cash from Operations and Net Capital Transaction Proceeds during the period of liquidation of the Company in the same manner and proportion as though the Company had not dissolved.  Following the payment of all debts and liabilities of the Company and all expenses of liquidation, and subject to the rights of the Members to set up such cash reserves in an amount and for so long as it may deem reasonably necessary as determined by the Members in good faith for the payment of contingent or unforeseen Obligations of the Company (including indemnification obligations), the proceeds of the liquidation and any other funds of the Company shall be distributed in accordance with <u>Section 3.1</u>.  Any cash reserves referred to in this Section shall be released and distributed as soon as practicable after the date that corresponding liabilities reserved against are satisfied, discharged or otherwise terminated.

(b)      Within a reasonable time following the completion of the liquidation of all assets of the Company by the Company, the Members shall cause a statement prepared by the Accountants to be delivered to the Members, which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of distributions payable pursuant to this Agreement.

(c)      Upon the completion of the liquidation of the Company and the distribution of all Company funds, the Company shall terminate and the Members shall have the authority to execute and record articles of dissolution of the Company as well as any and all other documents required to complete the dissolution and termination of the Company.

## ARTICLE 9
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 9.1   <u>Member Representations</u>.    Each Member ("**Representing Member**") hereby represents, warrants and covenants to the each other Member that:

(a)      Representing Member is a limited liability company, or is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization.  This Agreement has been duly executed and delivered by Representing Member, and Representing Member has all requisite power and legal capacity to execute and deliver this Agreement.

(b)     No consent of or approval by any Third Party is required as a condition to the entering into of this Agreement by the Representing Member.

(c)     This Agreement has been duly authorized, executed and delivered by the Representing Member and constitutes the valid and binding Obligation of the Representing Member, enforceable against it in accordance with its terms.

(d)     Neither the execution and delivery of this Agreement nor compliance with its terms will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Representing Member pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness, agreement or other instrument to which the Representing Member may be party or by which it or any of its properties or assets may be bound, or violate any provision of law or any applicable order, writ, injunction, judgment or decree of any court, or any order or other public regulation of any governmental commission, bureau or administrative agency.

(e)     No judgments are presently outstanding and unsatisfied against the Representing Member or any of its assets.  Neither the Representing Member nor any of its assets is involved in any litigation at law or in equity, or in any proceeding before any court, or by or before any governmental or administrative agency, which judgment, litigation or proceeding could, solely with respect to the Representing Member, reasonably be anticipated to have a material adverse effect on the Representing Member or its property or assets.   No such material judgment, litigation or proceeding is, to the best of the Representing Member's knowledge, threatened against the Representing Member and, to the best of the Representing Member's knowledge, no investigation looking toward such a proceeding has begun or is contemplated.

(f)     No order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any governmental agency, commission, board or public authority is required to authorize, or is required in connection with the execution, delivery and performance by the Representing Member of this Agreement or the taking of any action contemplated by this Agreement.

(g)     No Representing Member nor its Affiliates has dealt with any brokers, investment bankers, consultants or other third parties who are entitled to receive a commission or compensation in connection with obtaining or arranging any Member's Membership Interest or the negotiation or completion of this Agreement and the other transactions described in this Agreement.

(h)     Representing Member has been and are in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Bank Secrecy Act, as amended by The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, Title III of the USA PATRIOT Act, and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

(i)     Without implying that the Membership Interests are "securities" within the meaning of applicable securities laws, the Representing Member is acquiring its Membership Interests for investment and to evidence its investment in the Company and not with a view to the distribution of those Membership Interests in violation of any federal or state securities laws.

(j)     The Representing Member (1) is familiar with the business proposed to be conducted by the Company and any subsidiary of the Company; (2) has been advised that its interest in the Company may not be sold, transferred, or otherwise disposed of except as provided herein; (3) understands that its interest in the Company has not been registered under the Securities Act, or any State securities laws, in reliance on an exemption for private offerings or the fact that it is not a security, and if its interest in the Company is a security, the Representing Member may not be able to resell it unless it is registered under the Securities Act and applicable State securities laws or unless an exemption from such registration is available; (4) is a "sophisticated investor" with substantial prior experience in high-risk business investments of the type described in this Agreement and is aware of and familiar with the risks associated with a private limited liability company and would qualify as an "accredited investor" as such term is defined in Rule 501 of Regulation D, as enacted pursuant to Sections 3(b) and 4(2) of the Securities Act; (5) is familiar with the type of investment which its interest in the Company constitutes and has reviewed the acquisition of such interest with its tax and independent legal counsel and investment representatives to the extent it deems necessary; (6) was not solicited to invest in the Company through means of any general solicitation or general advertising; and (7) has been given the opportunity to ask questions of, and receive answers from, knowledgeable representatives of the Company, and all such questions have been answered to the Representing Member's satisfaction.

(k)     Class RV Member makes the representations and warranties set forth on Exhibit D hereof.

Section 9.2     Confidentiality.  No Member or any of their Affiliates shall disclose the terms of this Agreement without the prior written consent of the other Members except (a) to its attorneys, accountants and other advisors and investors, (b) to the extent required by law to any governmental agency or unit or in any Court proceeding, (c) to prospective assignees of Membership Interests or interests in the Member who agree to maintain the confidentiality of the provisions of this Agreement, (d) to an existing or prospective lender to the Company or (e) to their auditors, regulating agencies, rating agencies or underwriters.  No Member or any of their Affiliates shall disclose the fact that any Member or its Affiliates are Members or investors in the Company in advertising, press releases or other comparable statements to the public without the prior written consent of such Member (which consent shall not be unreasonably withheld, conditioned or delayed).  The provisions of this Section shall survive the expiration or other termination of this Agreement.

## ARTICLE 10
## CERTAIN TAX AND ACCOUNTING MATTERS

Section 10.1     Taxed as Partnership.  The Members intend that the Company shall be taxed as a partnership for federal and state income tax purposes and shall not take any action that may result in the Company being taxed as anything other than a partnership.  Each and all of the

provisions of Exhibit B annexed hereto and made a part hereof are incorporated herein and shall constitute part of this Agreement. Exhibit B provides for, among other matters, the maintenance of Capital Accounts, the allocation of profits and losses, and the maintenance of books and records.

Section 10.2   Tax Matters.

(a)   The Administrative Member is hereby designated as the partnership representative ("**Partnership Representative**") for purposes of Sections 6221 through 6241 of the Code, as amended by the Bipartisan Budget Act of 2015, and, as such, shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to (i) sign consents, enter into settlement and other agreements with such authorities with respect to any such examinations or proceedings and (ii) expend the Company's funds for professional services incurred in connection therewith. In such event, the Partnership Representative shall duly and timely elect under Section 6226 of the Code to require each Person who was a Member during the taxable year of Company that was audited to personally bear any tax, interest and penalty resulting from adjustments based on such audit and shall notify each such Person (and the Internal Revenue Service) of their share of such audit adjustments and, if for any reason, the Company is liable for a tax, interest, addition to tax or penalty as a result of such an audit, each Person who was a Member during the taxable year of the Company that was audited shall pay to the Company an amount equal to such Person's proportionate share of such liability, as determined by the Manager, based on the amount each such Person should have borne (computed at the tax rate used to compute the Company's liability) had the Company's tax return for such taxable year reflected the audit adjustment, and the expense for the Company's payment of such tax, interest, addition to tax and penalty shall be specially allocated to such Persons (or their successors) in such proportions.

Section 10.3   Tax Returns Preparation. The Partnership Representative shall cause to be prepared, at the Company's expense, for each Fiscal Year the Company returns of income for those tax authorities requiring filing. As soon as reasonably practicable after the end of each Fiscal Year, the Tax Matters Member shall use its commercially reasonable efforts to provide each Member with a copy of the Company's tax returns and the related federal and state Schedule K-1s. Such tax reports shall be provided to the Members no later than March 31 of the next Fiscal Year.

## ARTICLE 11
## MISCELLANEOUS

Section 11.1   Notices.

(a)   All notices, consents, requests for approval, demands, waivers or other communications (collectively referred to as a "**Notice**") required to be sent or otherwise applicable under this Agreement shall be in writing and shall be sent to each applicable Party, its or their legal counsel at the addresses set forth below. A Notice that complies with the requirements of this Section shall be deemed to have been duly given and received: (1) when delivered personally; (2) one (1) Business Day after being delivered to a reputable overnight

courier service, marked for next day delivery and with delivery charges prepaid by the sender; or (3) on the first Business Day after receipt, if delivered by email transmission to the email address of the addressee shown below, if the Notice is also sent by any means described in clause (1) or (2) above.

   (b)  The addresses for Notice are:

To the Company:

KOPF Acquisitions, LLC

Address: 2875 NE 191 Street, Suite 801
Telephone: +525554183139
Email: fmonroy@skybridgedevelopments.com

<u>with a copy to</u>:

Sabrina Smulevich, Esq.
Serber & Associates, P.A.

Address:  2875 NE 191 Street, Suite 801
Aventura, FL 33180
Telephone: (305)424-1040
Email: smu@serbrlawfirm.com

To the Sky Plus Member:

Skybridge Miami, LLC

Address: 2875 NE 191 Street, Suite 801
Telephone: +525554183139
Email: fmonroy@skybridgedevelopments.com

<u>with a copy to</u>:

Sabrina Smulevich, Esq.
Serber & Associates, P.A.

Address:  2875 NE 191 Street, Suite 801
Aventura, FL 33180
Telephone: (305)424-1040
Email: smu@serbrlawfirm.com

To the RV Member:

RIGI KOPF, LLC,
a Florida limited liability company

Address:
Telephone:
Email:

<u>with a copy to</u>:

Alex Kurkin, Esq.
Kurkin Forehand Brandes LLP

Address:  18851 NE 29th Avenue, Suite 303
Aventura, FL 33180
Telephone: 305-929-8500
Email: akurkin@kfb-law.com

  Section 11.2 <u>Entire Agreement</u>.  This Agreement, together with all Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to its subject matter. This Agreement supersedes any prior agreement or understanding among the Parties with respect to its subject matter, but shall not amend, modify, supersede or in any way affect any other

agreement or understanding among the Members or their Affiliates that do not relate to the subject matter of this Agreement.

Section 11.3   <u>Amendments</u>.   No provision of this Agreement may be amended, supplemented or waived except in a written instrument signed by all the Members.

Section 11.4   <u>Governing Law</u>.   This Agreement and the rights of the Parties shall be governed by, interpreted and enforced in accordance with the internal laws of the State of Florida without regard to principles of conflicts of laws.

Section 11.5   <u>Jurisdiction; Choice of Forum</u>.   Each Party hereby irrevocably (a) submits to the exclusive jurisdiction of Florida State or Federal Court sitting in the County of Miami-Dade, in any action or proceeding arising out of or relating to this Agreement, the relations between the Parties and any matter, action or transaction described in this Agreement, (b) agrees that any such courts shall have exclusive jurisdiction over such actions or proceedings, (c) waives the defense of inconvenient forum to the maintenance and continuation of such action or proceeding, (d) consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in <u>Section 11.1</u> and (e) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 11.6   <u>WAIVER OF JURY TRIAL</u>.   EACH MEMBER FOR ITSELF AND ON BEHALF OF ITS AFFILIATES HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT OR DISPUTE BETWEEN THE PARTIES (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

Section 11.7   <u>Successors and Assigns</u>.   This Agreement shall be binding upon and inure to the benefit of the Members and their Permitted Successors.

Section 11.8   <u>Captions</u>.   Captions contained in this Agreement in no way define, limit or extend the scope or intent of this Agreement.

Section 11.9   <u>Severability</u>.   If any provision of this Agreement or the application of such provision to any Party or circumstance shall be held invalid or unenforceable, the remainder of this Agreement or the application of that provision to another Party or circumstance shall not be affected thereby.

Section 11.10   <u>Email Signature</u>.   Any Party may deliver its signature to this Agreement or any Notice or other document described in this Agreement or relating to the Company by email transmission to the proper recipient.   Any document signed by a Party by email transmission and reasonably believed by the recipient to have been sent by or on behalf of that Party shall (a) be binding upon and fully enforceable against that Party as though it had delivered a manually-signed counterpart to the recipient, (b) be accepted by any Court as equivalent to a manually-

signed counterpart for purposes of any evidentiary rule and (c) no Party will object to the effectiveness or validity of such emailed signature.

Section 11.11 <u>Counterparts</u>.  This Agreement may be executed in several counterparts. If so executed, each of such counterparts shall be deemed an original for all purposes and all counterparts shall, collectively, constitute one agreement.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart and photocopies may be used.

Section 11.12 <u>Authorized Signatory</u>.  The Administrative Member shall have the right to designated one or more "**Authorized Signatories**" of the Company and each such Authorized Signatory, acting individually, is hereby authorized and empowered to execute on behalf of the Company any documents, agreements or instruments on such terms and conditions as the Administrative Member shall have deemed necessary, appropriate or convenient in accordance with the terms of this Agreement.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Authorized Signatory to execute any document, agreement or instrument on behalf of the Company.

Section 11.13 <u>Guaranties and Indemnities</u>.  Each Member shall cause a credit worthy Affiliate, reasonably acceptable to the other Member, to provide, jointly and severally, all guaranties required.  In furtherance of the foregoing, the Sky Plus Member and the RV Member (and a credit worthy Affiliate reasonably acceptable to the other Member) shall, simultaneously with the delivery of any such guaranty, enter into a cross-indemnity agreement in form and substance reasonably acceptable to the Members (the "**Cross-Indemnity**"), pursuant to which each of the parties thereto will share liability for any guaranty, in accordance with each Member's Percentage Interest.  Notwithstanding the foregoing, in the event any liability under any guaranty is caused by the fraud, willful misconduct or gross negligence of any Member (or any Affiliate thereof), then such Member and its credit worthy Affiliate shall be obligated to indemnify the applicable guarantor for one hundred percent (100%) of the obligations of such guarantor under any such guaranty.  If any Member (or any Affiliate thereof) shall fail to make a payment required pursuant to the Cross-Indemnity, then, in any such event, an amount equal to the amount of the failed payment under the Cross-Indemnity shall be treated as a Priority Capital Contribution and the Percentage Interests of the Members shall be adjusted in accordance with Section 2.3(a) in respect of such Priority Capital Contribution.

Section 11.14 <u>Representation of the Company</u>.  The Company represents and warrants that it was formed solely for the purpose of engaging in the transactions contemplated by this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be executed by a duly authorized officer, all as of the day and year first above written.

**SKY PLUS MEMBER**:

**SKYBRIDGE MIAMI, LLC**
a Delaware limited liability company

By: _____

Name: ___Ariel Zeev Picker___

Title: ___Managing Member___

**RV MEMBER**:

**RIGI KOPF, LLC,**
a Florida limited liability company

By: _____

Name: ___Ronald A. Vogel II___

Title: ___Managing Member___

**Exhibit A**

**<u>DEFINITIONS</u>**

Except as otherwise specified or as the context otherwise may require, in addition to the capitalized terms defined elsewhere in this Agreement, the following terms shall have the respective meanings set forth below whenever used in this Agreement:

"**Accountants**" means the approved firm of independent certified public accountants engaged from time to time by the Company for purposes of reviewing or auditing the Company's financial statements and performing such other duties requested by the Members including the preparation of required tax returns.

"**Additional Capital Contribution**" means amounts, if any, to be contributed to the capital of the Company by a Member pursuant to <u>Section 2.2</u> and <u>Section 2.3</u>.

"**Administrative Member**" means Administrative Member designated and serving in that capacity in accordance with <u>Section 4.3</u> at the time of any specified action or determination. The Sky Plus Member is designated as the initial Administrative Member.

"**Affiliate**" means (1) any officer, director, employee, shareholder, partner or member of a specified Person, (2) any Person Controlling, Controlled by or under Common Control with a specified Person, (3) any officer, director, employee, shareholder, partner or member of any Person in a Control relationship with a specified Person described in the preceding clause (2), (4) in case of a specified individual, his or her spouse, domestic partner, divorced spouse, parents, cousins, uncles, aunts, stepparents, brothers, sisters, children (natural or adopted), stepchildren, grandchildren and other members of the individual's extended family or (5) a Person in which any Person described in the preceding clauses (1) through (3) has an ownership or beneficial interest (whether a direct, indirect, residual or contingent interest) or as to which such Person serves as a trustee, general partner, managing member or in a similar fiduciary or decision-making capacity.

"**Agreement**" is defined in the Introduction.

"**Annual Budget**" is defined in <u>Section 4.9</u>.

"**Available Cash from Operations**" means all cash, funds, revenues and proceeds of the Company (other than Net Capital Transaction Proceeds and proceeds from any Company indebtedness) on hand and available for distribution from time to time after: (1) payment of all Company Costs that are due and payable as of such date, (2) provision for the payment of all Company Costs that the Company is obligated to pay within ninety (90) days of such date, (3) provision for any required Reserve Additions, and (4) provision for payment of such other amounts as the Members shall determine is necessary.

"**Authorized Signatory(ies)**" is defined in <u>Section 11.12</u>.

"**Bad Act**" is defined in <u>Section 4.6(b)(1)</u>.

A-1

"**Bankruptcy Proceeding**" means (1) the filing by a specified Person of a petition for its bankruptcy or reorganization under the U.S. Bankruptcy Code or the laws of any state of the United States, (2) the commencement against a specified Person with or without its consent or approval of any proceeding seeking its bankruptcy, liquidation or reorganization, appointment of a receiver or trustee of its assets, or comparable relief, which proceeding has not been dismissed or discontinued within ninety (90) days after its filing, (3) the conversion at any time of an involuntary proceeding of the type described in clause (2) into a voluntary proceeding with the consent of a specified Person, (4) the entry by a court of competent jurisdiction of a final and unappealable order granting any relief of the type described in clause (1) or (2) above, (5) the admission in writing by a specified Person of its inability to pay its debts generally as they become due and (6) the making by a specified Person of a general assignment for the benefit of its creditors.

"**Business Day**" means any day other than (i) a Saturday or Sunday, or (ii) a day on which the Federal Reserve Bank in the City of New York is not open for regular business.

"**Capital Account**" is defined in Section 1.1 of Exhibit B hereto.

"**Capital Contributions**" the capital contributions of the Members required or permitted under Sections 2.1, 2.2 and 2.3.

 "**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any succeeding law).

"**Company**" means the limited liability company formed pursuant to this Agreement.

"**Company Costs**" means all of the costs and expenditures of any kind and payments thereof made or to be made by the Company with respect to its operations and maintenance which are permitted under the terms of this Agreement or otherwise approved by the Members.

"**Contributing Member**" is defined in Section 2.3(a).

"**Control**", "**Controlling**" and "**Controlled by**" means the ability, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, to direct or cause the direction of the management and policies of a Person (including by being a general partner, a managing member, a manager, an officer or a director of the Person in question).

"**Controlled Affiliate**" means, with respect to the Sky Plus Member, any of the following:

>        (1)    the spouse, parents, grandparents and descendants (each, a "**Family Member**") of (A) Ariel Zeev Picker Schatz, Olga Schatz, or Vicky Rahunouv (each a "**Sky Plus Control Person**") or the trustees of any one or more trusts for the primary benefit of any one or more Family Members of a Sky Plus Control Person;

>        (2)    one or more corporations, partnerships, limited liability companies or other entities, eighty percent (80%) or more of the voting interests of which are

owned, directly or indirectly, by (A) any one or more Sky Plus Control Person, or (B) any one or more Family Members of a Sky Plus Control Person; or

        (3)    any one or more Sky Plus Control Persons.

With respect to the RV Member, the term "**Controlled Affiliate**" means any of the following:

        (1)    the spouse, parents, grandparents and descendants (each, a "**Family Member**") of (A) Ronald Vogel ("**RV Control Person**") or the trustees of any one or more trusts for the primary benefit of any one or more Family Members of a RV Control Person;

        (2)    one or more corporations, partnerships, limited liability companies or other entities, eighty percent (80%) or more of the voting interests of which are owned, directly or indirectly, by (A) any one or more RV Control Person, or (B) any one or more Family Members of a RV Control Person; or

        (3)    any one or more RV Control Persons.

"**Cross-Indemnity**" is defined in Section 11.13.

"**Deadlock**" is defined in Section 4.2(e).

"**Deposit**" is defined in Section 4.2(e).

"**Development Lease**" means that certain Amended and Restated Development Lease dated as of March 22, 2007, entered into between Lessor and Leseee as amended by that certain First Amendment to Amended and Restated Development Lease Agreement dated March 22, 2007, the Second Amendment to Amended and Restated Development Lease Agreement dated December 29, 2009, and further amended by that certain Third Amendment to Amended and Restated Development Lease Agreement dated August 4, 2015, pursuant to which Lesee leased from Lessor approximately 220 net acres located at the Miami Opa-Locka Executive Airport, as more particularly described in the Developmet Lease.

"**Effective Date**" is defined in the Introduction to this Agreement.

"**Electing Member**" is defined in Section 4.2(e)(1).

"**Election Notice**" is defined in Section 4.2(e)(1).

"**Event of Default**" it shall be deemed an Event of Default if any representation or warranty from the RV Member was intentionally false and/or wrongfully misleading when made.

"**Exercise Period**" is defined in Section 6.7(a).

"**Failed Contribution**" is defined in Section 2.3(a).

"**Fiscal Year**" of the Company means the 12-month period ending December 31 of each year; provided that the initial Fiscal Year shall be the period beginning on the Effective Date and ending on December 31 of the same year and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation, dissolution and termination of the Company is completed and ending on the date that such final liquidation, dissolution and termination is completed.  To the extent any computation or other provision of the Agreement provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the initial and final Fiscal Years to reflect that such periods are less than full calendar year periods.

"**Florida Act**" means the Florida Revised Limited Liability Company Act, as it may be amended from time to time, and any successor to that Act.

"**Indemnitee**" means either the Company, a Member or other Person that an Indemnitor is obligated to indemnify, defend and hold harmless pursuant to Section 4.5 as well as all present and former directors, officers, shareholders, partners, members, employees, agents (including accountants, attorneys and other professional advisers) and other Affiliates of the specified Indemnitee.

"**Indemnitor**" means either the Company, or a Member, obligated to indemnify, defend and hold harmless an Indemnitee pursuant to Section 4.5.

"**Lessee**" means AA Acquisitions, LLC, a Florida limited liability company

"**Lessor**" means Miami-Dade County, Florida.

"**Liens**" means any mortgage, deed of trust, pledge, lien, encumbrance, charge or security interest, other than liens for taxes not yet due and payable or for taxes that the taxpayer is contesting in good faith through appropriate proceedings.

"**Loan Documents**" means any note, loan agreement, mortgage, deed of trust or other written agreement or document evidencing or securing any financing of the Company.

"**Losses**" means the dollar amounts of all costs, claims, suits, actions, losses, liabilities, obligations, reasonable fees and expenses of any kind or nature, including costs and expenses of accountants, attorneys and other professionals, judgments, fines, penalties, settlements and all other costs and expenses of any nature or type actually paid or incurred by a specified Person or amounts expended in connection with curing or preventing any default under the Loan Documents if such default was or would be caused by or is related to a default by the guarantor under any applicable guaranty or indemnity and in the case of the prevailing Party, all actual out-of-pocket costs and expenses paid or incurred by the prevailing Party in litigating against the other Party or its Affiliate.

"**Major Decision**" is defined in Section 4.2(a).

"**Major Decision Notice**" is defined in Section 4.2(b).

"**Majority Member**" is defined in Section 4.2(c).

"**Miami Opa-Locka Executive Airport**" means that certain real property located at 14201 NW 42 Avenue, City of Opa-Locka, Miami-Dade County, Florida, and owned by Lessor.

"**Members**" means the Sky Plus Member and the RV Member and their Affiliates which own Membership Interest (if any) and their Permitted Successors in its or their capacities as members in the Company.

"**Membership Interest**" means the interest of a Member in the Company, including such Member's right: (1) to a distributive share of the assets or property of the Company as set forth in Articles 3 and 8; (2) to allocations of items of income, gain, loss, deduction and credit of the Company as set forth in Exhibit B of this Agreement; and (3) to participate in the management and operation of the Company in accordance with the terms set forth in Article 4 and elsewhere in this Agreement.

"**Minority Member**" is defined in Section 4.2(c).

"**Net Capital Transaction Proceeds**" means the available net proceeds (after making required payments of any financing of the Company and Company Costs).

"**Net Income**" and "**Net Losses**" mean for purposes of the tax provisions in Article 10 and Exhibit B, the income or losses of the Company as determined in accordance with the method of accounting followed by the Company for federal income tax purposes, including for all purposes: (1) any income exempt from tax; (2) any expenditures of the Company which are described in Section 705(a)(2)(B) of the Code or are treated as Section 705(a)(2)(B) expenditures under Treasury Regulation § 1.704-1(b)(2)(iv)(i); and (3) any adjustments to the book value of any Company asset pursuant to the Treasury Regulations; *provided, however*, if any property is carried on the books of the Company at a value that differs from that property's adjusted basis for tax purposes, then any gain, loss, depreciation and amortization with respect to such property shall be computed with reference to the book value of such property, consistently with the requirement of Treasury Regulation § 1.704-1(b)(2)(iv)(g); and provided, further, that any item allocated under Section 1.3 of Exhibit B shall be excluded from the computation of Net Income and Net Losses.

"**Non-Contributing Member**" is defined in Section 2.3(a).

"**Non-Electing Member**" is defined in Section 4.2(e)(1).

"**Notice**" is defined in Section 11.1.

"**Notice Date**" is defined in Section 4.2(e)(1).

"**Obligation**" means any contractual, legal, financial or other obligation or liability of a specified Person, whether fixed, contingent, matured or unmatured.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OFAC List**" is any list of prohibited countries, individuals, organizations and entities that is administered or maintained by OFAC, including: (i) Section 1(b), (c) or (d) of Executive

Order No. 13224 (September 23, 2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), any related enabling legislation or any other similar Executive Orders, (ii) the List of Specially Designated Nationals and Blocked Persons maintained by OFAC), and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, or (iii) a "**Designated National**" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515.

"**Offer**" is defined in Section 4.2(e)(2).

"**Operating Account**" is defined in Section 4.8.

"**Parties**" means the Members who have signed the Agreement.

"**Partnership Representative**" is defined in Section 10.2(a).

"**Percentage Interest**" means the percentage interest of each Member in certain distributions and allocations as set forth in this Agreement, subject to adjustment as provided in Section 2.3(a). The initial Percentage Interests of the Members are as follows: 60% to the Sky Plus Member and 40% to the RV Member.

"**Permitted Successor**" means the heirs, legatees, administrators, personal representatives, successors and assigns of a specified Party to the extent that a Transfer of that Party's Membership Interest in the Company or of an ownership or other beneficial interest in that Party is permitted by the terms of this Agreement or has been approved by the other Parties to the extent required by this Agreement.

"**Person**" means an individual or a general partnership, limited partnership, corporation, professional corporation, limited liability company, limited liability partnership, joint venture, trust, business trust, cooperative or association or any other legally-recognized entity.

"**Priority Capital Contribution**" is defined in Section 2.3(a).

"**Priority Return**" means eighteen percent (18%) per annum, compounded annually.

"**Property**" means that certain real property described in Exhibit D which is part of the Miami Opa-Locka Executive Airport.

"**Proposed Purchaser**" is defined in Section 6.7.

"**Proposed Value**" is defined in Section 4.2(e)(2).

"**Regulations**" means the Income Tax Regulations and Procedures and Administration Regulations promulgated under the Code, as amended from time to time.

"**Remaining Member**" is defined in Section 6.7.

"**Representing Member**" is defined in Section 9.1.

"**Reserve Additions**" for any period means all cash reserves reasonably determined, established and approved during that period by the Administrative Member for anticipated future Company Costs or required by the Loan Documents.

"**Right of First Refusal**" is defined in Section 6.7(a).

"**RV Member**" means RIGI KOPF, LLC, a Florida limited liability company and its transferees and assigns to the extent permitted by this Agreement.

"**Securities Act**" is defined in Section 6.6(b).

"**Seller's Notice**" is defined in Section 6.7.

"**Selling Member**" is defined in Section 6.7.

"**Sky Plus Member**" means Skybridge Miami, LLC, a Delaware limited liability company, and its transferees and assigns to the extent permitted by this Agreement.

"**SRO**" means a self-regulatory organization.

"**Subject Membership Interest**" is defined in Section 6.7(a).

"**Third Party**" means any other Person who is not a Party to this Agreement and not an Affiliate of a Party to this Agreement.

"**Transfer**" and related usages of that term means any sale, transfer, assignment, pledge, hypothecation or other disposal of all or any part of a Membership Interest (including economic interests) or any direct or indirect ownership interest in a Member in any manner, whether directly or indirectly by Transfer of all or a portion of any type of equity, profits, distribution or other ownership interest, and shall include the ability to approve or have any right to vote on, consent to or veto any decision or matter set forth in this Agreement and a right to receive any share or portion of payments of dividends, distributions or profits.

"**Treasury Regulations**" means the Income Tax Regulations and Procedures and Administration Regulations promulgated under the Code, as amended from time to time.

"**Unreturned Capital**" means, with respect to each Member, at any given time, the excess of its Capital Contributions over all distributions made to such Member in repayment thereof pursuant to Sections 3.1(c)(iii).

### Rules of Interpretation

The following rules shall be applied by the Members and all other Persons (including judges) in the determination, evaluation, interpretation and enforcement of the provisions of this Agreement, unless another provision of the Agreement expressly applies another rule:

(a)     The provisions of all Exhibits and Schedules to the Agreement are incorporated into and made an integral part of the Agreement as though they had been fully set forth in the actual text of the Agreement.

(b)     Any financial or accounting term used, but not otherwise defined, in this Agreement shall have the meaning given to it under GAAP.

(c)     Any reference to a right, benefit, action, decision or other item or matter in this Agreement is intended to allow its making, taking or other exercise to the fullest extent permitted by the Florida Act or other applicable law.

(d)     The word "including" is not limiting and shall be construed as meaning "including, without limitation."

(e)     Any provision of the Agreement that gives a Member or another Person the right, option or election to take or not take any action in any manner, shall not, and shall be deemed or construed to, require or obligate that Member or Person to take all or any part of such action.

(f)     The singular includes the plural and the plural includes the singular.

(g)     The masculine gender includes the feminine and neuter and vice versa.

(h)     References to a law include any rule or regulation issued under the law, any amendment to a law, rule or regulation, any successor law, rule or regulation and all applicable judicial interpretations of any such law, rule or regulation.

(i)     References to an Article, Section, Exhibit or Schedule mean a reference to an Article, Section, Exhibit or Schedule contained in or attached to the Agreement.

(j)     The caption headings of Articles and Sections in the Agreement are for convenience only and do not necessarily define, modify, extend, limit or describe the scope or intent of any of the terms of this Agreement.

(k)     The Agreement shall be interpreted and enforced in accordance with its provisions and without the aid of any custom or rule of law requiring or suggesting construction against the party drafting, commenting on, or causing the drafting or redrafting of, the provision in question.

## Exhibit B

## Capital Accounts; Tax Allocations

Section 1.1    Capital Account.  Capital Account means, with respect to each Member, the account established and maintained for the Member on the books of the Company in compliance with Treasury Regulation §§1.704-1(b)(2)(iv) and 1.704-2, as amended.  This Section shall be interpreted and applied in a manner consistent with such Treasury Regulations. Subject to the preceding sentence, each Member's Capital Account will initially equal the amount of cash and fair market value of property contributed (as of the date of such contribution, net of liabilities that the Company is considered to assume or take subject to under Code Section 752) by such Member to the Company and throughout the term of the Company will be (a) increased by the amount of (1) income and gains allocated to such Member pursuant to the following provisions of this Exhibit and (2) the amount of any cash and the fair market value of any property  subsequently contributed by such Member to the Company (as of the date of such contribution, net of liabilities that the Company is considered to assume or take subject to under Code Section 752), and (b) decreased by the amount of (1) losses and deductions allocated to such Member pursuant to the following provisions of this Exhibit and (2) the amount of distributions of cash and the fair market value of distributions of property (as of the date of such distribution, net of liabilities secured by the property that the Member is considered to assume or take subject to under Code Section 752) distributed to such Member.

Section 1.2    Capital Account Adjustments for Revaluations.  Whenever the Company would be permitted to adjust the Capital Accounts of the Members pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(f) to reflect revaluations of the assets of the Company, the Company may so adjust the Capital Accounts of the Members.  In the event that the Capital Accounts of the Members are adjusted pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(f) to reflect revaluations of the assets of the Company (a) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (b) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (c) the amount of upward and/or downward adjustments to the book value of the assets of the Company shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Exhibit.  In the event that Code Section 704(c) applies to the assets of the Company, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to the assets of the Company.

Section 1.3    Allocations of Net Income and Net Losses.

(a)    Allocation of Net Income.  After giving effect to Section 1.4 of this Exhibit, Net Income for any Fiscal Year of the Company shall be allocated as follows:

B-1

(1)     First, to the Members who have previously been allocated Net Losses pursuant to Section 1.4(f)(3), in proportion to the amount of Net Losses so allocated, until the aggregate Net Income allocated to each such Member pursuant to this Section 1.3(a)(1) is equal to the aggregate Net Losses allocated to that Member pursuant to Section 1.4(f)(3);

(2)     Second, to the Members who have previously been allocated Net Losses pursuant to Section 1.4(f)(2), in proportion to the amount of Net Losses so allocated, until the aggregate Net Income allocated to each such Member pursuant to this Section 1.3(a)(2) is equal to the aggregate Net Losses allocated to that Member pursuant to Section 1.4(f)(2);

(3)     Third, to the Members who have previously been allocated Net Losses pursuant to Section 1.3(b)(3), in proportion to the amount of Net Losses so allocated, until the aggregate Net Income allocated to each such Member pursuant to this Section 1.3(a)(3) is equal to the aggregate Net Losses allocated to that Member pursuant to Section 1.3(b)(3);

(4)     Fourth, to the Members who have previously been allocated Net Losses pursuant to Section 1.3(b)(2), in proportion to the amount of Net Losses so allocated, until the aggregate Net Income so allocated to each such Member pursuant to this Section 1.3(a)(4) is equal to the aggregate Net Losses allocated to that Member pursuant to Section 1.3(b)(2); and

(6)     Fifth, to the Members on a *pro rata* basis in proportion to their then current Percentage Interests.

(b)     Allocation of Net Losses.  After giving effect to Section 1.4 of this Exhibit, Net Losses for any Fiscal Year shall be allocated as follows:

(1)     First, to the Members who have previously been allocated Net Income pursuant to Sections 1.3(a)(6), in the reverse order (and in the same ratios as prior allocations of Net Income pursuant to Sections 1.3(a)(6)), until the aggregate Net Losses allocated to each such Member pursuant to this Section 1.3(b)(1) are equal to the aggregate Net Income allocated to that Member pursuant to Sections 1.3(a)(6);

(2)     Second, to the Members, in proportion to their respective positive Capital Account balances, until their respective Capital Accounts are reduced to zero; and

(3)     Third, to the Members in proportion to their then current Percentage Interests, provided that no loss shall be allocated to a Member who would not otherwise be entitled to such allocation.

Section 1.4    Other Allocation Provisions.

(a)    Minimum Gain Chargeback.    Except as otherwise provided in Treasury Regulations §1.704-2(f), notwithstanding anything to the contrary in this Exhibit, if there is a net decrease in "partnership minimum gain" (within the meaning of Treasury Regulation § 1.704-2(d)) for a Fiscal Year, then there shall be allocated to each Member items of income and gain for such Fiscal Year equal to such Member's share of the net decrease in partnership minimum gain (within the meaning of Treasury Regulation §1.704-2(f), provided, that if the Company has any discretion as to an exception set forth pursuant to Treasury Regulation §1.704-2(f)(5), the Members may exercise such discretion on behalf of the Company).    In the event that the application of the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members, the Members may request that the Commissioner waive the minimum gain chargeback requirement pursuant to Treasury Regulation §1.704-2(f)(4).  Any Member's share of Company Minimum Gain shall be determined in accordance with Treasury Regulation §1.704-2(g)(1).  The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulation §1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(b)    Member Minimum Gain Chargeback.    If during a Fiscal Year there is a net decrease in partner nonrecourse debt minimum gain (as determined in accordance with Treasury Regulation §1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that partner nonrecourse debt minimum gain (determined in accordance with Treasury Regulation §1.704-2(i)(5)) as of the beginning of the Fiscal Year shall, subject to the exceptions in Treasury Regulation §1.704-2(i)(4) (including the exceptions analogous to those in Treasury Regulation §1.704-2(f)(2), (3), (4) and (5), provided, that if a limited liability company has any discretion as to the exception set forth pursuant to Treasury Regulation §1.704-2(f)(5) as made applicable by Treasury Regulation §1.704-2(i)(4), the Members may exercise such discretion on behalf of the Company), be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the partner recourse debt minimum gain.  In the event that the application of the partner recourse debt minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members, the Members may request that the Commissioner waive the minimum gain chargeback requirement pursuant to Treasury Regulation §§1.704-2(f)(4) and 1.704-2(i)(4).  The foregoing is intended to be the "chargeback of partner recourse debt minimum gain" required by Treasury Regulation §1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(c)    Nonrecourse Deductions.    Notwithstanding anything to the contrary in this Exhibit, nonrecourse deductions shall be allocated to the Members on a *pro rata* basis, in proportion to their current Percentage Interests.  Nonrecourse deductions shall have the meaning set forth in Treasury Regulation §1.704-2(b)(1).

(d)    Qualified Income Offset.    If, during any Fiscal Year, a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation §1.704-1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases a deficit balance in the Member's Adjusted Capital Account, there shall be allocated to the Member items of income and gain (consisting of

B-3

a *pro rata* portion of each item of Company income (including gross income, and gain for such year), in an amount and manner sufficient to eliminate such deficit as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Treasury Regulation §1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation. A Member's "**Adjusted Capital Account**," at any time, shall equal the Member's Capital Account at such time (i) increased by the sum of (A) the amount of the Member's share of partnership minimum gain as defined in Treasury Regulation §1.704-2(g)(1) and (3), (B) the amount of the Member's share of partner nonrecourse debt minimum gain as defined in Treasury Regulation §1.704-2(i)(5), and (C) any amount of the deficit balance in its Capital Account the Member is obligated to restore on liquidation of the Company, and (ii) decreased by reasonably expected adjustments, allocations and distributions described in Treasury Regulation §§1.704-1(b)(2)(ii)(d)(4), (5) or (6). The foregoing is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(e)    <u>Member Nonrecourse Deductions</u>. Notwithstanding anything to the contrary in this Exhibit, to the extent required by Treasury Regulation §1.704-2(i), any items of income, gain, loss or deduction of the Company that are attributable to a nonrecourse debt of the Company that constitutes partner nonrecourse debt as defined in Treasury Regulation §1.704-2(b)(4) (including chargebacks of partner nonrecourse debt minimum gain) shall be allocated in accordance with the provisions of Treasury Regulation §1.704-2(i). This <u>Section 1.4(e)</u> is intended to satisfy the requirements of Treasury Regulation §1.704-2(i) (including the partner nonrecourse debt minimum gain chargeback requirements) and shall be interpreted and applied in a manner consistent therewith.

(f)    <u>Loss Limitation</u>. Notwithstanding anything to the contrary in <u>Section 1.3(b)</u> of this Exhibit,

(1)    The Net Losses allocated pursuant to <u>Section 1.3(b)</u> of this Exhibit to any Member for any Fiscal Year shall not exceed the maximum amount of Net Losses that may be allocated to such Member without causing such Member to have a negative balance in its Adjusted Capital Account at the end of such Fiscal Year.

(2)    If some but not all of the Members would have deficits in their Adjusted Capital Accounts as a consequence of allocations of Net Losses pursuant to <u>Section 1.3(b)</u> of this Exhibit, the limitations set forth in this <u>Section 1.4(f)</u> shall be applied by allocating Net Losses pursuant to this <u>Section 1.4(f)(2)</u> only to those Members who would not have a deficit in their Adjusted Capital Account as a consequence of receiving such an allocation of Net Losses (the allocation of such Net Losses among those Members to be in proportion to their Percentage Interests).

(3)    If no other Member may receive an additional allocation of Net Losses pursuant to Section 1.4(f)(2) of this Exhibit, such additional Net Losses not allocated pursuant to Section 1.4(f)(2) of this Exhibit shall be allocated solely

B-4

to those Members who bear the economic risks for such additional Net Losses within the meaning of Section 704(b) of the Code and the Treasury Regulations thereunder.

(g)     <u>Reversal of Regulatory Allocations</u>.  To the extent that any item of income, gain, loss or deduction has been specially allocated pursuant to paragraphs (a), through (f) of this <u>Section 1.4</u> and such allocation is inconsistent with the way in which the same amount otherwise would have been allocated under <u>Section 1.3</u>, subsequent allocations under <u>Section 1.3</u> of this Exhibit shall be made, to the extent possible and without duplication pursuant to a manner consistent with the Treasury Regulations under Code Section 704(b), which negate as rapidly as possible the effect of all such inconsistent allocations under paragraphs (a) through (f).

(h)     <u>Distributions of Property</u>.  Solely for the purpose of adjusting the Capital Accounts of the Members, and not for tax purposes, if any property is distributed in kind to any Member, the difference between its fair market value (as determined in the reasonable judgment of the Members) and its book value at the time of distribution shall be treated as gain or loss recognized by the Company and allocated pursuant to the provisions of <u>Section 1.3</u> of this Exhibit.

(i)     <u>Transfer of Membership Interest</u>.  Except to the extent otherwise required by the Code and Treasury Regulations, if a Membership Interest or part thereof is transferred in any Fiscal Year, the items of income, gain, loss, deduction and credit allocable to such Membership Interest or such Members, as the case may be, for such Fiscal Year shall be apportioned between the transferor and the transferee on a daily basis and shall be allocated to the person who held the interest on the date such items were realized or incurred by the Company.  At the request of the transferee, the Tax Matters Member may in its sole discretion make the election provided for in Code Section 754.

(j)     <u>Order of Allocations</u>.  Any allocations made pursuant to this Exhibit shall be made in the following order of priority:

        (i)     <u>Section 1.4(a)</u>;

        (ii)    <u>Section 1.4(b)</u>;

        (iii)   <u>Section 1.4(d)</u>;

        (iv)    <u>Section 1.4(e)</u>;

        (v)     <u>Section 1.4 (c)</u>;

        (vi)    <u>Section 1.4(g)</u>; and

        (vii)   <u>Section 1.3</u>, as modified by <u>Section 1.4(f)</u>.

Section 1.5     <u>Allocations for Income Tax Purposes</u>.  These provisions shall be applied as if all distributions and allocations were made at the end of the Fiscal Year.  Where any

provision depends on the Capital Account of any Member, that Capital Account shall be determined after the operation of all preceding provisions for the year.  The income, gains, losses, deductions and credits of the Company for federal, state and local income tax purposes shall be allocated in the same manner as the corresponding items entering into the computation of Net Income and Net Losses were allocated pursuant to Sections 1.3 and 1.4 of this Exhibit; provided that solely for federal, local and state income and franchise tax purposes and not for book or Capital Account purposes, income, gain, loss and deduction shall be allocated, other than with respect to the tax basis of property, as follows:  in the case of property contributed in kind, and in the case of other property, to the extent applicable, in accordance with the principles of Code Sections 704(b) and (c) and the Treasury Regulations promulgated thereunder.

Section 1.6    Distributions of Nonrecourse Liability Proceeds.  If during a Fiscal Year the Company makes a distribution to any Member that is allocable to the proceeds of any nonrecourse liability of the Company that is allocable to an increase in Company Minimum Gain pursuant to Treasury Regulation §1.704-2(h), then the Company shall elect, to the extent permitted by Treasury Regulation §1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in Company Minimum Gain.

**Exhibit C**

**Preapproved Decisions and Actions**

**Acquisition Loan Terms:**

**_Lender:_** AA Acquisitions, LLC, a Florida limited liability company

**_Loan amount_**: $8,121,500.00

**_Term_**: 24 months, with option to extend for an additional 12 months

**_Interest Rate_**: 6% per year

**_Repayment Terms_**: All accrued interest and principal due at Maturity

**_Security_**: Purchase Money Leasehold Mortgage and Security Agreement encumbering the Property

**_Prepayment_**: No prepayment penalty

**Exhibit D**

**The Property**

A portion of the lands within that Lease by and between Miami-Dade County, Florida, a political subdivisions of the State of Florida, and AA Acquisitions, LLC, as evidenced by that certain Memorandum of Lease recorded in Official Records Book 25479, Page 3983, as amended and as partially assigned to Opa-Locka Skybridge, LLC, a Florida limited liability company, as evidenced by that Partial Assignment and Assumption of Amended and Restated Lease recorded in Official Records Book _____, Page _____ and more particularly described as follows:

EAST:

A PORTION OF LAND LYING WITHIN THE COMBINED PROPERTIES OF THE OPA-LOCKA AIRPORT AND BEING A PORTION OF THE EAST HALF (E. 1/2) OF SECTION 20, TOWNSHIP 52 SOUTH, RANGE 41 EAST, MIAMI-DADE COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE CENTERLINE OF WRIGHT ROAD (N. W. 145th STREET), AS OCCUPIED, AND THE CENTERLINE OF LEJEUNE ROAD (N. W. 42nd AVENUE), AS OCCUPIED, SAID CENTERLINE OF LEJEUNE ROAD ALSO BEING THE WEST LINE OF THE SOUTHEAST ONE-QUARTER (S.E. 1/4) OF SAID SECTION 20; THENCE RUN NORTH 00 DEGREES 02 MINUTES 45 SECONDS EAST FOR 944. 73 FEET; THENCE SOUTH 89 DEGREES 54 MINUTES 27 SECONDS EAST FOR 770.51 FEET; THENCE NORTH 00 DEGREES 01 MINUTES 07 SECONDS WEST FOR 1017.98 FEET; THENCE NORTH 84 DEGREES 34 MINUTES 59 SECONDS EAST FOR 252.87 FEET; THENCE SOUTH 00 DEGREES 02 MINUTES 23 SECONDS EAST FOR 1023.62 TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL; THENCE NORTH 89 DEGREES 57 MINUTES 13 SECONDS EAST FOR 1494.05 FEET; THENCE SOUTH 01 DEGREES 21 MINUTES 38 SECONDS EAST FOR 485.14 FEET; THENCE NORTH 89 DEGREES 59 MINUTES 55 SECONDS WEST, ALONG A LINE 478.00 FEET NORTH OF AND PARALLEL WITH, AS MEASURED AT RIGHT ANGLES TO, THE OCCUPIED CENTERLINE OF WRIGHT ROAD (N. W. 145TH STREET), FOR 1505.27 FEET; THENCE NORTH 00 DEGREES 02 MINUTES 23 SECONDS WEST FOR 483.75 TO THE POINT OF BEGINNING.

ALL LYING AND BEING IN SECTION 20, TOWNSHIP 52 SOUTH, RANGE 41 EAST, MIAMI-DADE COUNTY, FLORIDA.

D-2

WEST

A PORTION OF LAND LYING WITHIN THE COMBINED PROPERTIES OF THE OPA-LOCKA AIRPORT AND BEING A PORTION OF THE EAST ONE-HALF (EAST 1/2) OF SECTION 20, TOWNSHIP 52 SOUTH, RANGE 41 EAST, MIAMI-DADE COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE CENTERLINE OF WRIGHT ROAD (N. W. 145TH STREET), AS OCCUPIED, AND THE CENTERLINE OF LE JEUNE ROAD (N. W. 42ND AVENUE), AS OCCUPIED, SAID CENTERLINE OF LEJEUNE ROAD ALSO BEING THE WEST LINE OF THE SOUTHEAST ONE-QUARTER (S.E. 1/4) OF SAID SECTION 20; THENCE RUN SOUTH 89°59'55" EAST ALONG THE OCCUPIED CENTERLINE OF WRIGHT ROAD (N.W. 145TH STREET) FOR 63.53 FEET; THENCE RUN NORTH 00°02'45" EAST FOR 478.00 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE CONTINUE NORTH 00°02'45" EAST FOR 466.63 FEET; THENCE SOUTH 89°54'27" EAST FOR 706.98 FEET; THENCE SOUTH 00°01'07" EAST FOR 465.51 FEET; THENCE NORTH 89°59'55" WEST, ALONG A LINE 478.00 FEET NORTH OF AND PARALLEL WITH, AS MEASURED AT RIGHT ANGLES TO, THE OCCUPIED CENTERLINE OF WRIGHT ROAD (N. W. 145TH STREET) FOR 707.50 FEET, TO THE POINT OF BEGINNING.

ALL LYING AND BEING IN THE EAST ONE-HALF (EAST 1/2) OF SECTION 20, TOWNSHIP 52 SOUTH, RANGE 41 EAST, MIAMI-DADE COUNTY, FLORIDA.

**Exhibit E**

**Representations and Warranties of RV Member**

(a)      The Company (i) is a single purpose entity established solely to engage in the business described in Section 1.5 (i) and (ii) of this Agreement, (ii) has not executed any contracts or agreements with any third parties, other than: (y) Purchase and Sale Agreement by and between AA Acquisitions, LLC and the Company, dated July 18, 2020, as amended by that certain First Amendment to Purchase and Sale Agreement dated August 30, 2019, that certain Second Amendment to Purchase and Sale Agreement dated October 16, 2019, that certain Third Amendment to Purchase and Sale Agreement dated December 16, 2019, that certain Fourth Amendment to Purchase and Sale Agreement dated February 27, 2020, and that certain Fifth Amendment to Purchase and Sale Agreement dated May 20, 2020, and that certain Sixth Amendment to Purchase and Sale Agreement dated June 16, 2020 (collectively the "Purchase Agreement") and (z) Lessor's Consent, Recognition and Non-Disturbance Agreement dated November 2019, true and complete copy of which have been provided to the Sky Plus Member (the "Existing Agreements"), and (iii) has not transacted any business of any kind or nature whatsoever, other than business described in Section 1.5 of this Agreement.

(b)      The Company is not in violation or default of any of the Existing Agreements.

(c)      There are no consents or approvals of governmental authorities or third parties that are required for the execution and delivery of this Agreement by the RV Member. RV Member has delivered true, correct and complete copies to the Sky Plus Member of (a) any contract or agreement that requires the payment of more than $500 in any one calendar year by the Company, and (c) there are no contracts of any kind relating to the management, leasing, construction, operation, maintenance or repair of the Property or the Company.

(d)      As of the Effective Date, there are no agreements between the Company and any Affiliate of the RV Member.

(e)      As of the Effective Date, the RV Member is not aware of any litigation, action or proceeding pending or threatened in writing, to which the RV Member, the Company or its direct or indirect owners is a party.

(f)      The RV Member has the capacity and authority to enter into this Agreement and to consummate the transactions herein provided and nothing prohibits or restricts the right or ability of such party to close the transaction contemplated hereunder or thereunder and carry out the terms hereof or thereof. None of this Agreement, any agreement, document or instrument executed or to be executed in connection with this Agreement, anything provided in or contemplated by this Agreement, or any such other agreement, document or instrument, does now or shall hereafter breach, invalidate, cancel, make inoperative or interfere with, or result in the acceleration or maturity of, any contract, agreement, lease, easement, right or interest, affecting, or relating to, the RV Member or the Company.

(g)      The RV Member has disclosed to the Sky Plus Member all material documents and information (including, without limitation, any reports, tests, financial statements, contracts,

E-1

leases, insurance information, tax information, surveys, title materials, permits, and studies) which the Sky Plus Member has requested, as of the Effective Date, pertaining to the Property.

(h)     The Membership Interest in the Company issued to the Members on the Effective Date are free and clear of all liens, charges, claims, and encumbrances whatsoever.  Prior to the Effective Date, neither the Company nor the RV Member (nor any Affiliate of the RV Member) has granted to any Person any option or other right to purchase to the interests and no Person has any option or other right to purchase the Membership Interest.

(i)     Prior to the Effective Date, there were no organizational documents (including, without limitation, any limited liability company agreement or other agreement) governing or otherwise associated with the Company except the Articles. There are no securities outstanding which carry the right to acquire any Membership Interest or subscriptions, warrants, options, calls, convertible securities, registration or other rights or other arrangements or commitments obligating the Company to issue, transfer or dispose of such Membership Interest, and there are no pre-emptive rights in respect of such Membership Interest. There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any of the Membership Interest.

(j)     RV Member has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by RV Member's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of RV Member's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of RV Member's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(k)     To RV Member's knowledge, all agreements, reports, certificates, affidavits, statements and other data furnished by the RV Member to the Sky Plus Member in connection with this Agreement are true and correct in all material respects and do not omit to state any material fact or circumstance necessary to make the statements contained therein not misleading.

E-2

# EXHIBIT B

**THE PROPER FLORIDA DOCUMENTARY STAMP AND INTANGIBLE TAX HAS BEEN PAID ON THIS PROMISSORY NOTE AND EVIDENCE OF SUCH PAYMENT APPEARS ON THE MORTGAGE EXECUTED OF EVEN DATE HEREWITH TO BE RECORDED IN THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

## PROMISSORY NOTE

$8,210,271.00

July 14, 2020

Miami, Florida

FOR VALUE RECEIVED, the undersigned **KOPF ACQUISITIONS LLC**, a Florida limited liability company ("Maker" and/or "Borrower") promises to pay to the order of **AA ACQUISITIONS, LLC**, a Florida limited liability company ("Lender" and/or "Holder"), at 15000 NW 44th Avenue Opa Locka, Florida 33054, or at such other place as Holder may from time to time designate in writing, the sum of Eight Million Two Hundred Ten Thousand Two Hundred Seventy-One and 00/100 Dollars ($8,210,271.00), in United States Dollars, together with interest thereon from the date hereof at the rate of interest set forth herein and payable as follows:

The interest rate shall be a fixed rate which is equal to six percent (6.0%) per annum (the "Note Rate"). Maker and Holder hereby acknowledge and agree that $1,088,771.00 of the principal amount has been allocated for the payment of the Assignment Fee (as defined in the Development Lease, as defined below) (the "Assignment Fee Principal") and that, provided that Maker does not default under this "Promissory Note" or the Mortgage (as defined below) beyond any applicable notice and cure periods, fifty percent (50%) of such Assignment Fee Principal (i.e., $544,385.50) shall not accrue interest. Interest as aforesaid shall be calculated using a 360-day year and twelve (12) consecutive 30-day months.

The entire outstanding principal balance together with all accrued interest shall be due and payable in full twenty-four (24) months after the date of this Promissory Note (the "Maturity Date"). Notwithstanding the foregoing, Borrower may extend the twenty-four (24) month period following the date of this Promissory Note set forth to a thirty-six (36) month period upon providing Lender with (a) not less than thirty (30) days prior written notice of Borrower's election to extend such period and (b) payment of all interest that would be due and payable under the Promissory Note accruing from the date of this Promissory Note through and including the date of the expiration of the twenty-four (24) month period following the date of this Promissory Note. In addition, in the event that Borrower pays the entire outstanding principal balance together with all accrued interest under this Promissory on or prior to the Maturity Date, and otherwise does not default under the terms of the Promissory Note or any of the other Loan Documents (as defined below), then the principal amount outstanding under this Promissory Note shall be reduced by $544,385.50 (i.e., fifty percent (50%) of the Assignment Fee applicable to the assignment of the Premises by Lender to

1

Borrower).  By way of example, provided that Borrower does not default under the terms of the Promissory Note or any of the other Loan Documents, Borrower and Lender acknowledge and agree that the calculations attached hereto as <u>Exhibit A</u> reflect the amounts that Borrower shall be obligated to pay Lender upon the (i) Maturity Date (i.e., Scenario 1) and (ii) the Maturity Date, as may be extended pursuant to the terms of this Promissory Note (i.e., Scenario 2).

Each Maker and endorser severally waives demand, protest and notice of maturity, non-payment or protest and all requirements necessary to hold each of them liable as makers and endorsers and consents without notice to any and all extensions of time or changes in terms of payment by the holder of this Promissory Note.

Each Maker and endorser, jointly and severally agrees to pay all costs of collection, including reasonable attorneys' fees, in the event it becomes necessary to protect the security hereof, whether suit be brought or not.

The said principal sum or the unpaid balance thereof, with interest thereon, shall become due and payable, at the option of the Holder, after default in the payment of any principal or interest, or after an event of default (beyond applicable notice and cure periods) under the Purchase Money Leasehold Mortgage and Security Agreement executed simultaneously herewith by Maker in favor of Holder (the "<u>Mortgage</u>") or any other Loan Document, within the time therein limited, or upon the occurrence of an Event of Default (defined below).  Should the Maker fail to pay any principal or interest hereunder within ten (10) days of when such payment is due, the Maker shall pay a late charge in the amount of five percent (5%) on the principal and interest so overdue.

From and after the occurrence of an Event of Default, as such term is hereinafter defined, under the Mortgage or this Promissory Note or the maturity thereof, whether normal maturity or accelerated maturity and after the expiration of all applicable cure and grace periods, the unpaid principal hereof, including the Assignment Fee Principal, shall bear interest at the greater of twenty-five percent (25%) or the highest lawful rate.

This Promissory Note is secured by the Mortgage and is to be construed and enforced according to the laws of the State of Florida.  Upon default in the payment of any of the terms and conditions of said Mortgage, and after the expiration of all applicable cure and grace periods, then, at the option of the Holder, the entire principal sum remaining unpaid, together with accrued interest, shall become immediately due and payable, without further notice.

The term "<u>Loan Documents</u>" shall mean any and all of the documents heretofore, now, or hereafter executed by Maker, by others or by Maker and others which wholly or partly secure or were, are, or will be executed in connection with the indebtedness evidenced by this Promissory Note, including, but not limited to, the Mortgage, and associated affidavits, disclosures and miscellaneous loan documentation.

This Promissory Note may be prepaid in whole or in part at any time without premium or penalty.  Any partial prepayment shall be applied first to the accrued interest until all accrued

2

interest has been paid in full, second toward principal other than the Assignment Fee Principal until all such principal has been paid in full, and then toward Assignment Fee Principal.

The Maker and any endorsers, sureties, and all others who are, or who may become liable for the payment hereof, severally expressly grant to the Lender a continuing first lien security interest in and authorize and empower the Lender, at its sole discretion, at any time after the occurrence of an Event of Default as such term is hereinafter defined and provided all applicable notice, grace and/or cure periods shall have expired, to appropriate and in such order as Lender may elect, apply to the payment hereof, any and all money, general or specific deposits, or collateral of any such parties now or hereafter in the possession of the Lender.

Maker, and any endorsers, sureties, and all others who are, or who may become liable for the payment hereof, severally, irrevocably, and unconditionally (a) agree that any suit, action, or other legal proceeding arising out of or relating to this Promissory Note may be brought, at the option of the Lender, in a court of record of the State of Florida in Miami-Dade County, in the United States District Court for the Southern District of Florida, or in any other court of competent jurisdiction; (b) consent to the jurisdiction of each such court in any such suit, action or proceeding; and (c) waive any objection which it or they may have to the laying of venue of any such suit, action, or proceeding in any such courts.

Upon the happening of any of the following events ("Event of Default"), each of which shall constitute a default hereunder, and after the expiration of all applicable notice, cure and grace periods all sums due hereunder shall thereupon or thereafter, at Lender's option, without further notice or demand, become immediately due and payable: (a) failure of any Obligor (which term shall mean and include each Maker, Endorser, Surety, or other party liable for payment of or pledging collateral or security under this Promissory Note) to pay on or before expiration of any applicable grace period, any sum due hereunder; (b) occurrence of an Event of Default under any of the Loan Documents or any other loan agreement or security instrument now or hereafter in effect which by its terms covers this Promissory Note or the indebtedness evidenced hereby; (c) occurrence of default, beyond any applicable notice, cure and grace periods, by Borrower under that certain Amended and Restated Development Lease Agreement dated March 22, 2007, by and between Miami-Dade County, Florida, a political subdivision of the State of Florida ("Lessor"), and Lender (the "Original Lease"), as amended by the First Amendment to Amended and Restated Development Lease Agreement dated as of July 24, 2007, by and between Lessor and Lender, the Second Amendment to Amended and Restated Development Lease Agreement dated December 29, 2009, by and between Lessor and Lender, the Third Amendment to Amended and Restated Development Lease Agreement dated August 4, 2015, by and between Lessor and Lender, as partially assigned by Lender to Borrower pursuant to that certain Partial Assignment of Lease of even date herewith (the Original Lease and all addenda thereto are collectively referred to herein as the "Development Lease"); (d) filing of any petition under the Bankruptcy Code or any similar federal or state statute by or against any Obligor or the insolvency of any Obligor and not discharged and dismissed within thirty (30) days from the filing thereof; (e) making of a general assignment by any Obligor for the benefit of creditors, appointment of or taking possession by a receiver, trustee or custodian or similar official for any Obligor or for any assets of any such Obligor or institution by or against any Obligor of any kind of insolvency proceedings or any proceeding for dissolution or liquidation of

3

any Obligor which is not dismissed within thirty (30) days of the filing thereof; (f) entry of a final non-appealable judgment in excess of $100,000.00 against any Obligor which is not satisfied or transferred to bond within thirty (30) days of the date of entry; (g) material falsity in any certificate, statement, representation, warranty or audit at any time furnished to Holder by or on behalf of any Obligor pursuant to or in connection with this Promissory Note, the Loan Documents or any loan agreement or Security Agreements now or hereafter in effect, which by its terms covers this Promissory Note for the indebtedness evidenced hereby or otherwise including any omission to disclose any substantial contingent or liquidated liabilities or any material adverse change in any facts disclosed by any certificate, statement, representation, warranty or audit furnished to Lender; (h) issuance of any writ of attachment or writ of garnishment or filing of any lien against any Collateral or the property of any Obligor which is not dismissed within thirty (30) days of the date of issuance or filing, whichever is applicable; (i) taking of possession of any material Collateral or of any substantial part of the property of any Obligor at the instance of any governmental authority; (j) dissolution, merger, consolidation, or reorganization of any Obligor without the prior written consent of Lender; (k) assignment or sale by any Obligor of any equity in Maker without the prior written consent of Lender; (l) cancellation of any guaranty with respect hereto (if any) without the prior written consent of Lender hereof; (m) occurrence of any Event of Default (after expiration of any applicable grace period) under any of the Loan Documents or obligations of Maker or of any Obligor to Lender; (n) the death of any guarantor of this Promissory Note (if any), unless if deeded reasonably necessary by Lender, a substitute guarantor reasonably acceptable to Lender is obtained within sixty (60) days of the death of such guarantor; or (o) Borrower incurring, creating, assuming or permitting to exist any additional indebtedness or liability, including without limitation, contingent liabilities, without the prior written approval of Lender, except for (i) the loan evidenced by this Promissory Note, (ii) the endorsement of checks for collection in the ordinary course of business and (iii) debt payable to lessees, suppliers and other trade creditors in the ordinary course of business on ordinary and customary trade terms and which is not past due.

Lender, shall have all of the rights and remedies of a creditor, mortgagee and secured party under all applicable law.

Without limiting the generality of the foregoing, upon the occurrence of an Event of Default hereunder, Holder may, at its option, and without notice or demand after the expiration of all applicable cure and grace periods (i) declare the entire unpaid principal and accrued interest accelerated and due and payable at once, together with any and all other liabilities of Maker or any such liabilities selected by Lender; and (ii) set-off against this Promissory Note all monies owed by Holder in any capacity to Maker, and Holder shall be deemed to have exercised such right of set-off, and to have made a charge against any such money immediately upon the occurrence of such default, although made or entered on the books subsequent thereto. To the extent that any of the Collateral is personal property and Holder elects to proceed with respect to it in accordance with the Uniform Commercial Code, then, unless that collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market, Holder will give Maker reasonable notice of the time and place of any public or private sale thereof. The requirement of reasonable notice shall be met if such notice is, at the option of Lender, hand delivered, sent via expedited courier, or mailed, postage prepaid to Maker, at the address given to Holder by Maker, or any other address shown on the records of Holder at least

4

five (5) days before the time of sale.  Upon disposition of any Collateral after the occurrence of an Event of Default hereunder, Maker shall be and shall remain liable for any deficiency; and Lender shall account to Maker for any surplus, but Lender shall have the right to apply all or part of such surplus (or to hold the same as reserve) against any and all other liabilities of Maker to Lender.

If the calculation of interest or the imposition of a change in the rate of interest after acceleration upon default or the payment of any fees or other charges which are construed to be interest under applicable law, rule, or regulation in effect from time to time, result in an effective rate of interest higher than that permitted to be paid under applicable law, rule, or regulation in effect from time to time, then such charges shall be reduced by a sum sufficient to result in an effective rate of interest no greater than the maximum effective rate of interest permitted to be paid under applicable law, rule or regulation in effect from time to time.  The Lender may, in determining the maximum rate permitted under applicable law, rule or regulation in effect from time to time, take advantage of: (i) the rate of interest permitted by Florida Statutes Chapter 665 (Florida Savings Association Act), by reason of both Section 687.12, Florida Statutes ("interest rates: parity among licensed lenders or creditors") and 12 United States Code, Sections 85 and 86, and (ii) any other law, rule or regulation in effect from time to time, available to Lender which exempts Lender from any limit upon the rate of interest it may charge or grants to Holder the right to charge a higher rate of interest than that permitted by Florida Statutes, Chapter 687. Upon maturity of this Promissory Note, whether by acceleration or in due course, interest shall be recalculated over the actual life of the loan based upon the amounts outstanding, and if the total amount of interest theretofore paid exceeds the amount permitted to be paid under applicable law, rule, or regulation in effect from time to time, the excess shall be credited to Principal, or if such excess exceeds the Principal amount due hereunder, refunded to the Maker.

<u>Single Purpose Entity</u>:  For so long as the indebtedness evidenced by this Promissory Note remains outstanding and unpaid, Maker shall maintain its existence as a Single Purpose Entity as such term is hereinafter defined.  A Single Purpose Entity is an entity that does not and shall not:

a. engage in any business or activity other than the ownership, operation and maintenance of the leasehold interest in the Premises and activities incidental thereto, which may include making distributions of profit to Borrower's partners so long as no Event of Default then exists;

b. acquire or own any material assets other than the leasehold interest in the Premises and such incidental personal property as may be necessary for the operation of the Premises;

c. merge into or consolidate with any entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent;

d. own any subsidiary or make any investment in any entity without the consent of Lender;

5

e.       commingle its assets with the assets of any of its members, managers, shareholders, affiliates, principals or of any other person; and

f.       fail to maintain its records, books of account and Lender accounts separate and apart from those of the members, managers, shareholders, principals and affiliates of a member, manager or shareholder of transferee, and any other person.

MAKER AND HOLDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION (INCLUDING BUT NOT LIMITED TO) ANY CLAIMS, CROSS CLAIMS OR THIRD PARTY CLAIMS ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS PROMISSORY NOTE, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN.  MAKER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE HOLDER NOR THE HOLDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE HOLDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.  MAKER ACKNOWLEDGES THAT THE HOLDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN, INCLUDING THIS PROMISSORY NOTE, BY, INTER ALIA, THE PROVISIONS OF THIS PARAGRAPH.

[Signature page to follow]

6

IN WITNESS WHEREOF, the undersigned has executed and delivered this Promissory Note as of the day and year first above written.

"MAKER"

**KOPF ACQUISITIONS, LLC,** a Florida limited liability company

By: _____

Name: RONALD   VOGEL

Title: Authorized   Representative

### EXHIBIT A
### (Payoff Calculations)

<u>Scenario 1:  Payoff at Maturity Date (24 months)</u>

| | | |
|---|---|---:|
| Principal Balance | $ | 8,210,271.00 |
| Interest (24-month period at 6% per annum) | | 985,232.52 |
| Subtotal | $ | 9,195,503.52 |
| Credit for 50% of Assignment Fee paid to MDAD | | (544,385.50) |
| Interest on Assignment Fee Credit (24-month period at 6% per annum) | | (65,326.26) |
| Payoff | $ | 8,585,791.76 |

<u>Scenario 2:  Payoff at Maturity Date, as Extended (36-months)</u>

| | | |
|---|---|---:|
| Interest Due at expiration of 24-month period (6% per annum) | $ | 985,232.52 |
| Principal Balance | $ | 8,210,271.00 |
| Interest (12-month extension period at 6% per annum) | | 492,616.26 |
| Subtotal | $ | 8,702,887.26 |
| Credit for 50% of Assignment Fee paid to MDAD | | (544,385.50) |
| Interest on Assignment Fee Credit (36-month period at 6% per annum) | | (97,989.39) |
| Payoff | $ | 8,060,512.37 |

8

# EXHIBIT C

**UNANIMOUS WRITTEN CONSENT**
**OF THE MANAGER AND MEMBERS**
**OF KOPF ACQUISITIONS, LLC**

**JULY 14, 2022**

**THE UNDERSIGNED**, constituting the sole manager (the "Manager") and all of the members (the "Members") of KOPF Acquisitions, LLC, a Florida limited liability company ("Borrower"), acting pursuant to the authority of the Florida Revised Limited Liability Company Act, hereby adopt the following recitals and resolutions in lieu of a meeting, effective as of the date hereof.

**WHEREAS**, Borrower desires to obtain a revolving loan in the maximum principal amount of $9,000,000.00 (the "Loan") from Bobe Holdings Limited Partnership, a Prince Edward Island (Canada) limited partnership (together with its successors and assigns, collectively, "Lender"), as evidenced by that certain Revolving Promissory Note, dated effective as of the date hereof, by Borrower in favor of Lender (the "Note"), and any other collateral documents, agreements, and instruments which secure, evidence, or are otherwise required by Lender in connection with the Loan (such other documents, agreements, and instruments, together with the Note, collectively, the "Loan Documents"); and

**WHEREAS**, the Manager and the Members wish to authorize, approve, and ratify the execution and delivery by Borrower of the Loan Documents and the incurrence of the Loan by Borrower pursuant to the Loan Documents, and certain other matters set forth herein.

**NOW, THEREFORE, BE IT RESOLVED**, that the Manager and the Members hereby authorize, approve, and ratify, without any further action by or authority or direction from Borrower, the Loan and its being evidenced and secured by, and being repayable in accordance with the terms, conditions, and provisions of, the Loan Documents, and Borrower's entry into the Loan Documents, and that Borrower is authorized to do all acts and execute and deliver all such documents as may be reasonably required or necessary in connection with the Loan Documents and Borrower's incurrence of the Loan; and be it

**FURTHER RESOLVED**, that the Manager, in his capacity as the manager of Borrower, or any officer of the Company, acting alone, and acting on behalf of Borrower, be and hereby is authorized to approve the form of, execute, and deliver the Loan Documents and any and all other documents, instruments, and agreements and all supplements and amendments to any of the same as may be required in connection with the execution of the Loan Documents and the transactions contemplated thereby, as the Manager or such officer may deem advisable, the undersigned hereby ratifying and confirming the acts of the Manager or any such officer in connection with the execution and delivery of all of such documents, agreements, and instruments, irrespective of whether such acts were performed before or subsequent to the date of the adoption hereof, and directing the Manager, the Members, the officers, and the agents of Borrower under each and all such documents, agreements, and instruments; and be it

**FURTHER RESOLVED**, that a copy hereof shall be entered in the minute books or other corporate records of Borrower as evidence of such resolutions; and be it

**FURTHER RESOLVED**, that these resolutions may be executed in one or more counterparts, each of which shall be deemed an original, but together shall constitute the same instrument; and signatures delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, shall be given the same legal force and effect as original signatures.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the undersigned have given their consent to the foregoing resolutions as of the date first above written.

**MANAGER:**

FELIPE MONROY

**MEMBERS:**

SKYBRIDGE MIAMI, LLC,
a Delaware limited liability company

By: _____
Name: Ariel Zeev Picker
Title: Managing Member

RIGI KOPF, LLC,
a Florida limited liability company

By: _____
Name: Ronald A. Vogel II
Title: Manager

[SIGNATURE PAGE TO UNANIMOUS WRITTEN CONSENT OF THE MANAGER AND MEMBERS OF
KOPF ACQUISITIONS, LLC]

# EXHIBIT D

## REVOLVING PROMISSORY NOTE

$9,000,000.00                                                      July 14, 2022

FOR VALUE RECEIVED, the undersigned, **KOPF ACQUISITIONS, LLC**, a Florida limited liability company ("Borrower"), hereby unconditionally promises to pay to the order of **BOBE HOLDINGS LIMITED PARTNERSHIP**, a Prince Edward Island (Canada) limited partnership ("Lender"), the principal sum of Nine Million and No/100 Dollars ($9,000,000.00), or so much thereof as is advanced pursuant hereto, in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Interest Rate, and to be paid in accordance with the terms of this Note.

Prior to the occurrence of an Event of Default (as hereinafter defined), interest on the outstanding principal balance of, and all other sums owing under, this Note, shall accrue and be payable from and after the date hereof, at a rate equal to seven percent (7%) per annum (the "Interest Rate"). Upon the occurrence and during the continuation of an Event of Default, the Interest Rate shall automatically increase to the lesser of (x) fifteen percent (15%) per annum, compounded annually, or (y) the highest rate permitted by applicable law. For purposes of calculating interest accrued hereon at the Interest Rate, interest on this Note shall be calculated on the basis of the actual days elapsed over a 360-day year.

The principal balance of this Note and all accrued interest thereon shall be due and payable on January 10, 2023. Any failure of Borrower to make any payment in accordance with this Note shall constitute an "Event of Default" hereunder.

All payments on this Note shall be made in lawful money of the United States of America in immediately available funds.

Borrower may prepay any portion of this Note outstanding in whole or in part without penalty. Any partial payment shall be applied to (i) first, any accrued and outstanding interest under this Note and (ii) second, the principal amount of the Note outstanding, and shall not postpone the due date of any subsequent installments or charge the amount of such installments, unless Lender shall otherwise agree in writing.

Upon the occurrence of an Event of Default, or commencement of any proceedings under any bankruptcy, insolvency or similar laws by or against Borrower, all amounts payable by Borrower to Lender under this Note shall immediately become due and payable by Borrower to Lender without notice to Borrower or any other person, and Lender shall have all of the rights, powers, and remedies available under this Note and the Florida Uniform Commercial Code.

Notwithstanding anything to the contrary contained herein, in no event shall the amount payable by Borrower as interest or other charges on this Note exceed the highest lawful rate permissible under any law applicable hereto and any payments in excess of such highest lawful rate shall either be applied to the principal hereof or refunded to Borrower.

1

Borrower shall also pay Lender a loan origination fee in the amount of seventy-five hundredths of one percent (0.75%) of the maximum principal amount of the loan under this Note (equal to $67,500.00).

Borrower hereby waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

Time is of the essence in this Note.

Neither any provision of this Note nor any performance hereunder may be amended or waived orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. No right or remedy conferred upon the parties under this Note is intended to be exclusive of any other right or remedy contained herein or in any instrument or document delivered in connection herewith, and every such right or remedy shall be cumulative and shall be in addition to every other such right or remedy contained herein and/or now or hereafter existing at law or in equity or otherwise. No delay or omission on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or of any other right or remedy under this Note nor as a waiver of such right or remedy in connection with any future default.

In the event any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of Florida, without regard to its conflicts of law provisions.

This Note may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Borrower hereby irrevocably submits to the jurisdiction of any federal or state court sitting in the State of Florida over any action or proceeding arising out of or related to this Note and agrees that personal jurisdiction over Borrower rests with such courts for purposes of any action on or related to this Note. Borrower hereby waives personal service by manual delivery and agrees that service of process may be made by prepaid certified mail directed to Borrower at the address of Borrower set forth below or at such other address as may be designated in writing by Borrower, and that upon mailing of such process such service will be effective as if Borrower was personally served. Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any manner provided by law. Borrower further waives any objection to venue in any such action or proceeding on the basis of inconvenient forum. Borrower agrees that any action on or proceeding brought against Lender shall only be brought in such courts. All notices, requests, demands, claims, and other communications

2

hereunder shall be in writing and shall be delivered by overnight delivery with a nationally known courier service, or facsimile transmission if such transmission is confirmed by delivery by overnight delivery with a nationally known courier service to the following addresses and telecopy numbers (or to such other addresses or telecopy numbers which such party shall designate in writing to the other parties):

<table>
<tr><td>If to Borrower:</td><td>2875 NE 191 Street, Suite 801<br>Attention: Felipe Monroy</td></tr>
<tr><td>If to Lender:</td><td>[_____]<br>[_____]<br>Attention: Ariel Zeev Picker</td></tr>
</table>

BORROWER EXPRESSLY WAIVES ANY AND EVERY RIGHT TO A TRIAL BY JURY IN ANY ACTION ON OR RELATED TO THIS NOTE.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*ACTIVE 66415541v1*

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed as of the date first above written.

BORROWER:

KOPF ACQUISITIONS, LLC,
a Florida limited liability company

By: _____
Name: Felipe Monroy
Title: Manager

# EXHIBIT E

**BOBE HOLDINGS LIMITED PARTNERSHIP**
141 Kent Street, Suite 300
Charlottetown, PE C1A 1N3

September 1, 2023

**Via Overnight Delivery**

KOPF Acquisitions, LLC
2875 NE 191 Street, Suite 801
Attention: Felipe Monroy

      Re:    Revolving Promissory Note in the original principal amount of $9,000,000.00 (the "Note"), dated effective as of July 14, 2022, by KOPF Acquisitions, LLC, a Florida limited liability company ("Borrower"), in favor of Bobe Holdings Limited Partnership, a Prince Edward Island (Canada) limited partnership ("Lender"). *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note.*

Dear Mr. Monroy:

      Pursuant to the Note, the original principal balance of the Note and all accrued and unpaid interest thereon were due and payable on January 10, 2023. Accordingly, an Event of Default has occurred, and Lender hereby notifies Borrower that an Event of Default has occurred, under the Note, effective as of January 10, 2023. Lender hereby reserves all rights and remedies available to Lender under the Note and the Florida Uniform Commercial Code. As of the date hereof, Borrower is required to pay Lender the original principal balance of the Note and all accrued and unpaid interest thereon in the aggregate amount of $8,520,509.38. Lender hereby requests payment of such amount no later than September 30, 2023, pursuant to the wire instructions attached hereto as Exhibit A. Time is of the essence.

      If you have any questions regarding the foregoing, please do not hesitate to contact me.

                     Sincerely,

                     **BOBE HOLDINGS GP, LLC**, a Delaware limited liability company, as General Partner

                     By: _Isaac Behar J._
                     Name: Isaac Behar
                     Title: Authorized Signatory

## EXHIBIT A

**Wire Instructions**

Account in the name of: BOBE HOLDINGS LP

Account number: B87693002

US Dollars wires should be sent to:JPMorgan Chase Bank, N.A.

383 Madison Avenue

New York, NY 10017

SWIFT# - CHASUS33 (optional for Domestic wire transfers)

ABA # - 021000021

Account Number – 5187693002

For Account of – BOBE HOLDINGS LP

# EXHIBIT F

September 6, 2023

**RIGI KOPF LLC**, a Florida limited liability company
535 Sabal Palm Road
Miami, Florida 33137

**Via Email and Overnight Mail:** a/ 535 Sabal Palm Road, Miami, Florida 33137

Tracking Number:

Attn.: Ronald Vogel

RE: KOPF Acquisitions LLC (the "Company") - Capital Call – Section 2.2

Dear Mr. Vogel,

I am writing on behalf of Skybridge Miami LLC, a Delaware limited liability company, in its role as Administrative Member, under the operating agreement of KOPF Acquisitions LLC, a Florida limited liability company, dated July 10, 2020 (hereinafter referred as the "Operating Agreement").

Pursuant to Section 2.2 of the Operating Agreement, the Administrative Member is requesting Additional Capital Contributions from the Members for a total amount of Nine Million Four Hundred Thousand Dollars ($9,400,000.00) as detailed in Annex 1.

In accordance with the Company's records, Rigi KOPF LLC holds Forty percent (40%) of the Company's Membership Interests and is therefore required to contribute Three Million Seven Hundred Sixty Thousand Dollars ($3,760,000.00) within ten (10) business days of the receipt of the present written notice. Failure to make such contribution shall result in the dilution of Rigi KOPF LLC's Membership Interests in accordance with Section 2.3 of the Operating Agreement.

Respectfully,

Name: Felipe Monroy Torres

Title: Manager of Skybridge Miami LLC

**With a copy to:**

Alex Kurkin, Esq.

Kurkin Forehand Brandes LLP

Address: 18851 NE 29th Avenue, Suite 303, Aventura, FL 33180

Email: akurkin@kfb-law.com

Tracking Number:

ANNEX 1

*CAPITAL REQUEST BREAK DOWN:*

- **BOBE HOLDINGS LTDP (sep, 30th, 2013)**                    **$8,520,509.38**
- **SKY HARBOUR:**                                                             **$469,161.18**
    - o  $418,449.32 for Civil Revisions for taxilane (demo, fence relocation, and asphalt)
    - o  $13,483.30 for grading and sod on north side of taxilane
    - o  $7,828.56 for taxilane edge line and centerline striping
    - o  $29,400.00 for fence rental of 1,500 lf between Sky Harbour and KOPF until 1/31/2024 (We will pay this and not reimburse Sky Harbour)
    - o
- **KOPF ACQUISITIONS LLC funds required to**
    **cover expenses (until Dec 31ˢᵗ, 2023)**                    **$408,413.22**
    - o  $2,400.00 for Accounting Services
    - o  $88,000.00 for Paragon (Project Management)
    - o  $20,000.00 for Erik Greenwald
    - o  $108,047.12 for MIA rent (considering October increase)
    - o  $7,800.00 for Pollution policy
    - o  $65,297.50 for Schwebke (Civil engineering)
    - o  $198,868.60 for Schenkel (Architectural services)
    - o  Less $82,000.00 from Fountaibleu Rent

- **KOPF ACQUISITIONS LLC reserve funds**                    **$1,916.22**

**TOTAL:**                                                             **$9,400,000.00**

September 6, 2023

**SKYBRIDGE MIAMI LLC**, a Florida limited liability company
Turnberry Plaza, Suite 801
2875 N.E. 191st Street
Aventura, Florida 33180

<u>**Via Email and Overnight Mail:**</u> a/ Turnberry Plaza, Suite 801, 2875 NE 191ST Street, Aventura, FL 33180

Tracking Number:

<u>Attn.:</u> Ariel Picker

<u>RE:</u> KOPF Acquisitions LLC (the "Company") - Capital Call – Section 2.2

Dear Mr. Picker,

      I am writing on behalf of Skybridge Miami LLC, a Delaware limited liability company, in its role as Administrative Member, under the operating agreement of KOPF Acquisitions LLC, a Florida limited liability company, dated July 10, 2020 (hereinafter referred as the "Operating Agreement").

      Pursuant to Section 2.2 of the Operating Agreement, the Administrative Member is requesting Additional Capital Contributions from the Members for a total amount of Nine Million Four Hundred Thousand Dollars ($9,400,000.00) as detailed in Annex 1.

In accordance with the Company's records, SkyBridge Miami LLC holds Forty percent (60%) of the Company's Membership Interests and is therefore required to contribute Five Million Six Hundred Fourty Thousand Dollars ($5,640,000.00) within ten (10) business days of the receipt of the present written notice. Failure to make such contribution shall result in the dilution of SkyBridge Miami LLC's Membership Interests in accordance with Section 2.3 of the Operating Agreement.

Respectfully,

Name: Felipe Monroy Torres

Title: Manager of Skybridge Miami LLC

**With a copy to:**

Daniel Serber,

Serber & Associates P.A.

Address: Turnberry Plaza, Suite 801, 2875 NE 191ST Street, Aventura, FL 33180

Email: djs@serberlawfirm.com

ANNEX 1

*CAPITAL REQUEST BREAK DOWN:*

- **BOBE HOLDINGS LTDP (sep, 30th, 2013)**            **$8,520,509.38**
- **SKY HARBOUR:**                                              **$469,161.18**
    - $418,449.32 for Civil Revisions for taxilane (demo, fence relocation, and asphalt)
    - $13,483.30 for grading and sod on north side of taxilane
    - $7,828.56 for taxilane edge line and centerline striping
    - $29,400.00 for fence rental of 1,500 lf between Sky Harbour and KOPF until 1/31/2024 (We will pay this and not reimburse Sky Harbour)
    - 
- **KOPF ACQUISITIONS LLC funds required to**
  **cover expenses (until Dec 31st, 2023)**               **$408,413.22**
    - $2,400.00 for Accounting Services
    - $88,000.00 for Paragon (Project Management)
    - $20,000.00 for Erik Greenwald
    - $108,047.12 for MIA rent (considering October increase)
    - $7,800.00 for Pollution policy
    - $65,297.50 for Schwebke (Civil engineering)
    - $198,868.60 for Schenkel (Architectural services)
    - Less $82,000.00 from Fountaibleu Rent

- KOPF ACQUISITIONS LLC reserve funds                    $1,916.22

**TOTAL:**                                                        **$9,400,000.00**

Filing # 182252528 E-Filed 09/20/2023 02:47:12 PM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>RIGI KOPF, LLC</u>
Plaintiff

Case # <u>2023-023321-CA-43</u>
Judge <u>Thomas J. Rebull</u>

vs.

<u>SKYBRIDGE MIAMI, LLC, Felipe Monroy Torres, Ariel Zeev Picker Schatz, Olga Schatz Skvirsky</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

- ☐ $8,000 or less
- ☐ $8,001 - $30,000
- ☐ $30,001- $50,000
- ☐ $50,001- $75,000
- ☐ $75,001 - $100,000
- ☒ over $100,000.00

### III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☒ Negligence—other
    ☐ Business governance
    ☒ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
      ☐ Residential Evictions
      ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>5</u>

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
      ☐ yes
      ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
      ☒ no
      ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
      ☐ yes
      ☒ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
      ☐ yes
      ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ JOHN H RUIZ</u>            Fla. Bar # <u>928150</u>
          Attorney or party                  (Bar # if attorney)

<u>JOHN H RUIZ</u>                  <u>09/20/2023</u>
(type or print name)            Date